**In the Matter of NUMERIC CORP., Bankrupt.**

**Appeal of Russell E. BLANK.**

**No. 73–1103.**

United States Court of Appeals, First Circuit.

Heard Sept. 5, 1973.

Decided Oct. 17, 1973.

Frederic N. Halstrom, Boston, Mass., with whom William A. Cotter, Jr., Leo V. Boyle, and Parker, Coulter, Daley & White, Boston, Mass., were on brief, for appellant.

Sidney J. Kagan, Boston, Mass., with whom Richmond, Rosen & Kagan, Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE, Circuit Judge, and KILKENNY, Senior Circuit Judge*.

McENTEE, Circuit Judge.

This appeal arises out of bankruptcy proceedings and involves interpretation of the term "security agreement" employed in the Uniform Commercial Code (UCC) as adopted by Massachusetts. Mass.Gen.Laws Ann. ch. 106, § 9–203(1)(b) (1958).[1] The issue arises from the following circumstances.

In 1962 the appellant, Russell E. Blank, and one Robert Dean organized Numeric Corporation for the purpose of engaging in a general machine shop and engineering business. Numeric was formally incorporated under Massachusetts law on April 13, 1962, at which time Dean became the company's president, treasurer, and one of its directors. Blank held no position with Numeric but owned fifty of the 100 shares of stock issued by the corporation. It appears from the testimony before the referee in bankruptcy that Blank was the principal source of Numeric's working capital in the early days of the venture, while Dean's main contribution was his practical experience in the field. Prior to its formal date of incorporation, Blank engaged in two transactions with the company. He agreed to loan Numeric $16,000 in cash and also sold the company numerous items of machinery for $18,300. Blank subsequently received separate promissory notes for each transaction. It is with regard to the sale of the machinery that the current dispute arose.

Blank contends that in addition to the promissory note, he received a security interest in the machinery. The trustee in bankruptcy rejected that claim on the ground that the debtor (Numeric) failed to sign a "security agreement" containing a description of the collateral. Mass.Gen.Laws Ann. ch. 106, § 9–203(1)(b) (1958).

The transfer of the machinery to Numeric occurred by bill of sale, dated March 2, 1962. In this document Blank listed the various items of machinery in terms of quantity, description, and, in most cases, serial number. The bill of sale recited that consideration for the transfer was one dollar and "other good and valuable consideration." There was no express mention of a security interest.

On April 13 a special meeting of the directors was held. Among the resolutions unanimously approved at this meeting was the following:

"VOTED: That the Clerk of the corporation prepare standard form, Uniform Commercial Code financing statements on behalf of the corporation as debtor, to Russell Blank, as the secured party, in such manner and form as to cover Russell Blank's security interest in the property of this corporation as set forth in a Bill of Sale dated March 2, 1962, from said Russell Blank to the corporation, and as hereafter acquired, and as evidence of his security interest in the same. That the treasurer, Robert Dean, be and hereby is authorized to execute and deliver the same to said Russell Blank on behalf of the corporation."

On the same day Numeric gave Blank a promissory note for $18,300, without interest. There was no express mention of a security interest in this note.

---

* Of Ninth Circuit sitting by designation.

1. "§ 9–203. *Enforceability of Security Interest; Proceeds, Formal Requisites.* (1) Subject to the provisions of section 4–208 on the security interest of a collecting bank and section 9–113 on a security interest arising under the Article on Sales, a security interest is not enforceable against the debtor or third parties unless
  (a) the collateral is in the possession of the secured party; or
  (b) the debtor has signed a security agreement which contains a description of the collateral . . . ."

Also on April 13 Numeric prepared a financing statement which referred to Blank as the "secured party" and listed as property "covered" by this statement the same items of machinery detailed in the March 2 bill of sale, with one exception. While the bill of sale referred to "2 Harding Hand Screws," the financing statement was later changed to read "Harding Hand Screw." As so changed, this statement was filed with the state on June 15, 1962, in accordance with the UCC. Mass.Gen.Laws Ann. ch. 106, §§ 9–401 to 9–403 (1958).

There is conflicting testimony as to whether on April 13 a document formally labelled "security agreement" was also drawn up. It does appear that such a document, although unsigned, was in existence during the next month. On June 21 Blank received a letter from David Baye, attorney for Numeric, which referred to a formal document called the security agreement.[2]

It appears that nothing more was ever done with regard to the formal security agreement referred to in Baye's letter to Blank. In his testimony, Dean maintained that in fact he never signed a document of that nature. No party has come forward with the document in either signed or unsigned form and no one has explained its disappearance.

On June 26, 1963, Numeric was adjudged bankrupt. Blank filed a petition on November 26, 1965, to establish a security interest in the machinery he sold to Numeric. Following an evidentiary hearing the referee denied the petition, finding that no security agreement was given to Blank by Numeric, and on March 14, 1973, the district court dismissed Blank's petition for review.

Blank's right to enforce a security interest in the machinery that he sold to Numeric is dependent upon his showing that "the debtor has signed a security agreement which contains a description of the collateral . . .." Mass. Gen.Laws Ann. ch. 106, § 9–203(1)(b) (1958). The UCC defines "security agreement" as "an agreement which creates or provides for a security interest." Mass.Gen.Laws Ann. ch. 106, § 9–105(h) (1958). The UCC further defines "agreement" as "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this chapter." Mass. Gen.Laws Ann. ch. 106, § 1–201(3) (1958).

The referee in bankruptcy found that no formal security agreement had ever been signed by Numeric. Blank has

2. "Supplementing my letter of June 20th and enclosures, and pursuant to your inquiry regarding same, all the machinery listed in Schedule 'A' of the Agreement of March 3rd is covered in the Financing Statements recorded on June 15th, as well as in the Security Agreement (Chattel Mortgage), with the exception of one (1) Harding Hand Screw which I understand you intend to or have sold. Arthur Taylor [a director of and accountant for the corporation] has a duplicate original of that agreement, or has already given it to you, and the various items are set-forth in the attached Schedule marked 'A'.

I have this date delivered to Arthur's office the Security Agreement together with secured party copy of the Financing Statement. As I mentioned to you, and as you and Bob [Dean] agreed, the Agreement states that Note # 2 [the $18,300 due on machinery] will at all times be subordinate to Note # 1 [Blank's $16,000 cash loan to Nu-

meric], however there is also the provision that Note #1 may be rewritten in the event you purchase new equipment. There was some discussion, but no final agreement as to what would happen if Note # 1 were replaced with a new note and whether or not Note # 2 would still be subordinate to the new note. This is one matter that both you and Bob should have some further discussion on and if you reach an understanding that can be reduced to writing, please jot it down and I will incorporate it in the agreement by amendment.

In the interim, Arthur will determine the figures to be inserted in the Security Agreement, complete it, have Bob sign it as President and Treasurer, and give you the original and return the copy to my office for inclusion in the corporate records. I understand that the Security Agreement does not have to be filed unless it is intended to be used as a Financing Statement."

conceded that point on appeal. Instead, he contends that whether or not a formal security agreement was executed, the documents set forth above establish that a security agreement which complies with § 9–203(1)(b) was already in existence.

Thus, two questions are before this court. First, is a formal security agreement required by § 9–203(1)(b) of the UCC? Second, assuming that it is not, did a security agreement in compliance with § 9–203(1)(b) exist upon the particular facts of this case? We answer both questions in favor of the appellant and reverse the judgment of the district court.

The courts of Massachusetts have not as yet had occasion to discuss the issues raised here. However, in answering these questions, we feel free to draw upon the decisions of other jurisdictions that have adopted the UCC. As an introductory point, we note the continuing tension in all cases in this area between the need for development of uniform commercial practices among the various jurisdictions, *see* Mass.Gen.Laws Ann. ch. 106, § 1–102(2)(c) (1958), and the desire to recognize and effectuate the intentions of the parties in particular situations. This case seems to embody that conflict.

■ As to the first question posed, we have little difficulty concluding that a separate formal document entitled "security agreement" is not always necessary to satisfy the signed-writing requirement of § 9–203(1)(b). The draftsmen of the UCC ascribed two purposes to that requirement. One purpose was evidentiary, to prevent disputes as to precisely which items of property are covered by a secured interest. *See* Uniform Commercial Code § 9–203, Comment 3; J. K. Gill Co. v. Fireside Realty Inc., 262 Or. 486, 488, 499 P.2d 813 (1972). The second purpose of the signed-writing requirement is to serve as a Statute of Frauds, preventing the enforcement of claims based on wholly oral

representations. *See* Uniform Commercial Code § 9–203, Comment 5.

Given these two limited purposes of § 9–203(1)(b), and the flexible definitions of "security agreement" and "agreement" found elsewhere in the Code, there seems to be no need to insist upon a separate document entitled "security agreement" as a prerequisite for enforcement of an otherwise valid security interest. A writing or writings, regardless of label, which adequately describes the collateral, carries the signature of the debtor, and establishes that in fact a security interest was agreed upon, would satisfy both the formal requirements of the statute and the policies behind it. *See* Nunnemaker Transp. Co. v. United Cal. Bank, 456 F.2d 28, 31–32 (9th Cir. 1972); In re United Thrift Stores, Inc., 363 F.2d 11, 14 (3d Cir. 1966); In re Carmichael Enterprises, Inc., 334 F. Supp. 94, 105 (N.D.Ga.1971), aff'd per curiam, 460 F.2d 1405 (5th Cir. 1972); In re Fibre Glass Boat Corp., 324 F. Supp. 1054, 1055–56 (S.D.Fla.), aff'd per curiam, 448 F.2d 781 (5th Cir. 1971); Evans v. Everett, 279 N.C. 352, 359–360, 183 S.E.2d 109 (1971).

■ The decidedly more difficult issue is whether, in the absence of a separate formal document, an agreement which satisfies § 9–203(1)(b) has been shown to exist on the facts of this case. A considerable body of case law has developed to the effect that a standard-form financing statement, taken alone, cannot also be considered a "security agreement" that satisfies § 9–203(1)(b). *See, e. g.,* Mitchell v. Shepherd Mall State Bank, 458 F.2d 700, 703–704 (10th Cir. 1972); Needle v. Lasco Indus. Inc., 10 Cal.App.3d 1105, 1108–1109; 89 Cal. Rptr. 593, 595–596 (1970); American Card Co. v. H. M. H. Co., 97 R.I. 59, 62, 196 A.2d 150, 152 (1963). The rationale of these decisions is that the function of a financing statement is merely to put third parties on notice that the secured party who has filed it *may* have a perfected security interest in the collateral described. A financing statement alone

does not establish that in fact a security interest has been agreed upon.

However, although a standard form financing statement by itself cannot be considered a security agreement, an adequate agreement can be found when a financing statement is considered together with other documents. *See* In re Carmichael Enterprises, Inc., *supra*; In re Fibre Glass Boat Corp., *supra;* In re Center Auto Parts, 6 UCC Rep.Serv. 398 (C.D.Cal.1968); Evans v. Everett, *supra*. But cf. Kaiser Aluminum & Chemical Sales, Inc. v. Hurst, 7 UCC Rep. Serv. 730 (Iowa 1970). In the *Carmichael* case, for example, the district court held that a financing statement and a letter from the creditor on which the debtor wrote, "Agreed," taken together, constituted a security agreement. The description of collateral was in the financing statement and the evidence of agreement was in the notation on the letter. In *Center Auto Parts, supra,* the court held that a financing statement and a promissory note on which was written, "This note is secured by a certain financing statement," taken together, constituted a security agreement.

In this case, we find that the financing statement and the directors' resolution, taken together, constitute a security agreement within the meaning of § 9–203(1)(b). The financing statement's itemization of machinery covered by the security agreement fulfills the evidentiary purpose of the statute.[3] The directors' resolution establishes that an agreement in fact existed to give Blank a security interest and thus fulfills the Statute of Frauds purpose of the statute. To deny enforcement of the security interest in this case would represent a warrantless reliance on formalism and violate the general rule that the UCC be "liberally construed and applied to promote its underlying purposes and poli-

cies." Mass.Gen.Laws Ann. ch. 106, § 1–102(1) (1958).

In reaching this conclusion, we have been troubled by the presence in this case of a factor not present in other cases in this area: the apparent intention of the parties to execute a formal security agreement which for some reason never came into existence. The trustee in bankruptcy indicates in his brief that the failure to execute a formal document forecloses a finding on our part that an agreement already existed to grant Blank a security interest in the machinery. However, as the sequence of events developed, it seems the more logical conclusion that the formal document would only have memorialized an agreement which had already been made and was established by preceding writings. Referring to the June 21 letter from the company counsel to Blank, we note that the unresolved question about the subordination of one note to the other was not to prevent the signing of the formal agreement, but would be resolved by amendment at some later point. As to the reference to Arthur Taylor "determin[ing] the figures to be inserted in the Security Agreement," all evidence before us leads to the conclusion that this was to have been a purely ministerial function, based on the agreement already in existence, and not a matter for future negotiation between Blank and the company. While certainly we cannot recommend the sequence of events under consideration here as a model for the creation of security interests in the future, it would be inequitable to prevent the effectuation of the intended agreement between the parties through a narrow reading of the statute when we are satisfied that the purposes of the statute have been fulfilled.

The district court's order of dismissal is hereby vacated and the case is remanded to that court for the entry of an order consistent with this opinion.

---

3. Because we rely upon the financing statement as the definitive listing of property covered by the security agreement, Blank's security interest includes only one Harding Hand Screw.