### In re LEVINE'S DELICATESSEN & RESTAURANT, INC., Debtor.

### Bankruptcy No. 80 B 12103.

United States Bankruptcy Court,
S.D. New York.

Oct. 10, 1985.

Siegel, Sommers & Schwartz, New York City by Paul Milbauer, New York City, for Bass & Bass, Inc.

Winston & Sherman, P.C., New York City by Howard L. Sherman, New York City, for Chemical Bank.

Robert Schindler, New York City, Trustee.

## DECISION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

Bass & Bass, Inc., seeks an order modifying the automatic stay pursuant to Section 362(d) of the Bankruptcy Code, 11 U.S.C. § 362(d) and allowing the foreclosure on the proceeds of collateral of an alleged purchase money security agreement between Bass and Levine's Delicatessen (the "debtor"). Chemical Bank cross moves to foreclose on the proceeds of the collateral. It and the Trustee oppose the Bass & Bass motion.[1] The Trustee further

---

**1.** Since these motions seek to have the Trustee    turn over property, the proceeding should have

asserts that if the motion is granted, he is entitled to 10% of the gross proceeds and that his auctioneer is entitled to an additional 10%, plus expenses.

## I

Levine's Delicatessen & Restaurant, Inc. ("debtor") filed a petition under Section 301 of the Bankruptcy Code, 11 U.C.C. § 301 (1984) on September 5, 1980, seeking to reorganize pursuant to Chapter 11. The case was subsequently converted to a liquidation under Chapter 7 and Robert Schindler appointed Trustee. The debtor's assets, including the collateral which is the subject of the Bass & Bass agreement, was sold at a public auction on February 17, 1982, pursuant to an order of this Court. The sale yielded gross proceeds of $42,975.00. The parties agree that $22,999.55 of these proceeds relates to a security agreement that Bass & Bass claims to have entered into with the debtor.

Bass & Bass filed a motion to foreclose on the proceeds of collateral on February 27, 1985, alleging that in connection with a purchase of restaurant equipment from Bass & Bass for $70,000.00 with interest at 16%, the debtor entered into a security agreement for payment of that sum on October 8, 1979. A document in the form of a security agreement was attached to the motion papers and was signed by both parties. No description of collateral was contained in the form or annexed to it. It is not disputed that Bass filed a financing statement and various UCC–1 forms signed by both parties with the County Clerk's Office of Bronx County and with the Secretary of State on January 10, 1980, prior to the debtor obtaining the collateral. *See* N.Y. Uniform Commercial Code § 9–313(4) (1982) ("N.Y.U.C.C."). That financing statement did have a list of collateral attached to it.

Chemical Bank, relying on the absence of a description of collateral in the security agreement, thereupon cross-moved for an order declaring that its general lien securing the payment of two promissory notes is superior, and that the proceeds from the sale of the collateral should be turned over to it. For the same reason, the Trustee filed an objection to the allowance of the Bass claim as a secured claim. Bass then submitted additional papers which contained a copy of a schedule of collateral asserting it to be part of the original security agreement signed by both Bass and the debtor on October 8, 1979. The original security agreement with a description of collateral annexed to it was subsequently produced.

To Chemical and the Trustee, the assertion of a contemporaneous agreement identifying collateral is spurious. They contend that it was manufactured for the purpose of prevailing on the motion. At the evidentiary hearing held on July 25, 1985, however, Lewis Bass of Bass & Bass testified, with no evidence to the contrary, that on the day the security agreement was executed a schedule of collateral had been prepared and both parties had agreed to it. He further testified that the security agreement was signed and yet left incomplete because it is Bass & Bass policy to leave the space for the description blank until both parties have thoroughly reviewed the schedule. The partially completed form is photocopied. After review of the description by both parties, a secretary is to attach the description and type into the appropriate space on the agreement, "see attached listing". Bass claims that in this case the entire process occurred within one day of October 8, 1979, the day the security agreement was executed.

We find this testimony credible and there is no evidence otherwise, other than the copy of the agreement submitted with the motion and the belated appearance of the original. As to that, Bass' demeanor and the forthrightness of his testimony under persistent cross-examination credibly estab-

been instituted as an adversary proceeding pursuant to Rule 7001 of the Rules of Bankruptcy Procedure. *In re L.G. Edwards Farm, Inc.,* 30 B.R. 842, 844 (Bankr.E.D.Mo.1983). No objection was raised as to the procedure employed, trial was held in accordance with Part VII of those rules, and no prejudice to any party occurred from the manner of proceeding.

lish the truth of his assertion that the photocopy of the incomplete document had been inadvertently sent to counsel rather than fraudulently prepared later.

Having found that the agreement was executed as claimed, we turn to the legal issue of whether a security agreement is created when the schedule of collateral is attached after the document has been signed by both parties.

## II

Section 9–203 N.Y.U.C.C. provides in part:

1. Subject to the provisions of ..., a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless

a) the collateral is in the possession of the second party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral....;

b) value has been given; and

c) the debtor has rights in the collateral.

This section and the commentary to it affirm that a security interest is created when the requirements listed in Section 9–203(1)(a), (b) and (c) have been completed. They express no requirement that all prerequisites be satisfied simultaneously. *In re Associated Transport, Inc.*, 3 B.R. 124, 133 (Bankr.S.D.N.Y.1980). No New York authority addressing whether a subsequent attachment of a description of collateral complies with § 9–203(1) has been called to our attention; nor have we been able to find any. The cases in other jurisdictions are split. *Compare In re Allen*, 395 F.Supp. 150, 151 (E.D.Ill.1975) (where debtor signed a security agreement before a description of the collateral was attached to it, the court stated that the crucial question was whether the various requirements for the creation of a security interest had been completed and not whether the requirement be completed in a particular order); *In re Blundell*, 25 UCC Rep. 571 (D.Kan. 1978); *Rempa v. LaPorte Production*

*Credit Ass'n.*, 444 N.E.2d 308 (Ind.App. 1983) *with In re Hein*, 20 UCC Rep. 745 (Bankr.W.D.Wis.1976); *In re Couch*, 5 UCC Rep. 255 (Bankr.MD.Ga.1968) (subsequent attachment invalid).

In a recent case applying New York law, our sister Bankruptcy Court held that a security agreement will arise from related documents which taken together satisfy the requirements of UCC Section 9–203. *In re Coffee Cupboard, Inc.*, 33 B.R. 668 (Bankr.E.D.N.Y.1983). That willingness to find a security agreement is in accord with the basic policy that the UCC be liberally construed in accord with the "custom, usage and agreement of the parties." N.Y.U. C.C. Section 1–102(1)(b).

Illustrative of this flexibility is *In re Bollinger*, 614 F.2d 924 (3d Cir.1980). There the court held that certain outside writings which referred to a security agreement the parties intended to create, were sufficient to form such an agreement. This finding was conditioned on the existence of certain key elements central to any security agreement: (1) there must be a writing; (2) it must be signed by the debtor; and (3) that writing must contain a description of the collateral. 614 F.2d at 926. Similarly, in *In re Numeric*, 485 F.2d 1328 (1st Cir.1973), the court held that a "[s]eparate formal document entitled 'security agreement' is not always necessary to satisfy the signed writing requirement of Section 9–203(1)(a)" provided there is a "writing or writings, regardless of label, which adequately describes the collateral, carries the signature of the debtor, and established that in fact a security interest was agreed upon, would satisfy both the formal requirements of the statute and the policies behind it." *Id.* at 1331.

Given the dearth of contrary New York authority, it appears that the New York courts would agree. The requirement of a writing embodied in N.Y.U.C.C. § 9–203(1)(a) is in the nature of a statute of frauds, *see* Official Uniform Comment to § 9–203. Under New York law, the memorandum necessary to satisfy the statute of

433

frauds need not consist of one document, it may be "pieced together out of separate writings" not all of which need to be signed. *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 54, 110 N.E.2d 551 (1953); *Margate Industries, Inc. v. Samincorp. Inc.*, 582 F.Supp. 611, 617 (S.D.N.Y.1984). Although the signed writings need not contain all of the essential terms of the contract, they must clearly establish a contractual relationship between the parties and be transactionally related. *Crabtree*, 305 N.Y. at 54–56, 110 N.E.2d 551, *Margate Industries*, 582 F.Supp. at 617. It would thus be inconsistent with New York authority to hold to the contrary in this almost identical consideration of the requirements of N.Y.U.C.C. § 9–203(1)(a).

 In applying these concepts here, the evidence clearly establishes the parties' intention to create a security agreement. There was clearly a writing signed by both parties. There is no claim that the schedule inadequately described the collateral. We thus hold that the attachment within one day of an accurate schedule of collateral agreed to by the parties to the agreement satisfies the requirements of N.Y.U.C.C. § 9–203(1).

### III

With respect to the trustee's claim for commissions for the estate and the auctioneer, Section 506(c) of the Bankruptcy Code provides,

The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

 Bass and Bass only agree that the proceeds should be charged with auctioneer's commissions in the amount requested ($2,069.95). Having conceeded the appropriateness of that charge, however, no reason appears for not recognizing the expenses incurred by the auctioneer for they were of equal benefit. As to the Trustee's claim, there is no evidence that he incurred any costs or expenses or that his services conveyed any benefit to the secured creditor. Accordingly, he may not recover his charge under § 506(c). *In re Flagstaff Foodservice Corp.*, 739 F.2d 73 (2d Cir. 1984).[2]

Upon the foregoing findings of fact and conclusions of law, the motion of Bass & Bass should be granted subject to 10% commissions and expenses to be paid to the auctioneer, the cross-motion of Chemical Bank should be denied and the Trustee's request for additional commissions denied.

SETTLE ORDER.

---

**2.** He similarly may not recover on the basis of consent by Bass & Bass allegedly reflected in a letter from the Trustee to former counsel to Bass & Bass dated February 10, 1982. The letter was not introduced into evidence.