In re Jeffrey J. PARKER, Lesley L. Parker, Debtors.

Jeffrey J. PARKER and Lesley L. Parker, Plaintiffs,

v.

MICHIGAN NATIONAL BANK, Defendant.

Bankruptcy No. HK 87 1105.
Adv. No. 87 570.

United States Bankruptcy Court, W.D. Michigan.

Aug. 10, 1988.

Edward Read Barton, Allegan, Mich., for plaintiffs.

Thomas C. Clinton, Grand Rapids, Mich., for defendant.

## OPINION

LAURENCE E. HOWARD,
Bankruptcy Judge.

### NEW ISSUES AND RELIEF UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)

The court held a trial on March 31, 1988, on the debtors' complaint under Federal Rule of Civil Procedure 60(b) to vacate that portion of the court's order of April 28, 1987, which granted a replacement lien in 1987 crops to Michigan National Bank. At the conclusion of the trial the court adjourned the hearing to allow the submission of post-trial briefs.

On April 10, 1987, the debtors filed their petition under chapter 12. On that same day (not April 9th as stated in the complaint) the debtors filed a motion entitled "Motion Requiring ASCS Office To Turn Over Program Benefits And Authorizing Debtors To Use Same." On April 21, 1987, Michigan National Bank filed an "Objection To Motion Re: Authorization To Use ASCS Program Benefits." In paragraphs 3,5,6 and 7 of that objection Michigan National Bank claimed a security interest in the ASCS payments as cash collateral. A hearing was held on the Motion and Objection on April 28, 1987. Counsel for both the debtors and the Bank were present at that hearing. Jeffrey Parker was called as a witness. One exhibit, identified as "ASCS Production Figures" was received. At the conclusion of the hearing the court granted the debtor's motion. On the same day the court signed an order allowing the debtors to use their ASCS payments to plant the 1987 crop. The order also provided that "Michigan National Bank is hereby granted a replacement lien on the 1987 crops, to the extent that these funds are used for planting the 1987 crop." The "funds" referred to are the ASCS payments in which the Bank asserted a security interest. It should be noted that that order was drafted by Mr. Barton, the debtors' attorney, who had the debtor rush it back to the court for signing later in the same day of the hearing.

Paragraph 13 of the debtor's complaint alleges the following:

That upon reviewing documents in preparation for defending the Adversary Proceeding filed by Michigan National Bank objecting to dischargeability and calculating amounts necessary to fund the Plan, the Debtors and their Attorney just discovered that Michigan National Bank did not retain a security interest in the 1986 ASCS payments and as a result was not entitled to a replacement lien on the 1987 crop and have by virtue of that fact improved their position by approximately $25,000.00 which would otherwise be unsecured.

It should be noted that the debtors here claim to have "just discovered" this lack of a security interest. This complaint was signed on November 12, 1987 and filed on November 17, 1987. The nondischargeability complaint referred to was filed on July 9, 1987, and answered on September 1, 1987.

At the trial the debtors sought to introduce evidence of the negotiation of the security documents which form the foundation of the Bank's alleged security interest in the ASCS payments. The Bank objected, based on the parol evidence rule. At the time I reserved ruling. I now rule that this evidence is admissible solely for the purpose of establishing whether the grounds for relief under Rule 60(b) are present, for such use can in no way contravene the terms of any written agreement or the parol evidence rule.

At the trial the debtor testified that when he negotiated the 1986 security agreements he did not understand that he was giving the Bank a security interest in the ASCS payments. (Transcript of March

31, 1988, at pages 15–16.) Testimony was then introduced showing that the April 28th order authorized the use of the 1986 ASCS payments to plant the 1987 crop, and also gave the Bank a replacement lien in the proceeds of the 1987 crop to the extent that the 1986 ASCS payments subject to the Bank's asserted lien were used to plant that 1987 crop. The debtor then testified as follows:

Q (By Mr. Barton): Mr. Parker, did you realize at the time that we agreed to that replacement lien that Michigan National Bank might not have a lien on the 1986 or '87 ASCS payments?

A Yeah.

Q You did know it then?

A Well, we thought that.

Q But you hadn't verified it?

A That's correct.

Q When was it that you became aware of the fact that and when you—withdraw that. When did you look into this issue further?

A As soon as we got home we looked over the papers to determine that.

Q And do you recall when you next brought it to my attention?

A Not exactly. I'm sure it was as soon as we saw you after that.

Transcript, at pp.19–20.

The bank's attorney, Mr. Clinton, returned to this subject in his cross-examination:

Q Mr. Parker, you indicated that at the hearing on use of cash collateral in which you agreed to have the bank grant a replacement lien so that you could use your ASCS payments, that you thought that the bank might not have a lien but you had to verify it?

A That's correct. We went and checked over our papers to be sure.

Q So I understand, you didn't know if the bank did or didn't after looking over the papers?

A I knew that we had not discussed it, and there's nothing in the papers like '85, for it.

Q You went to the papers to decide that, is that correct?

A That's correct.

Q And you understand that what governs the agreement with the bank is what the papers say?

A I suppose.

Q And you don't have any knowledge that the agreement is any different with the bank than the paper says what it is?

A I know we never discussed giving them ASCS payments in '86, but we did in '85. The '86 security agreement doesn't say it like it does in '85, and that was my understanding when I got the loan.

Q That's what your understanding was. Why didn't you bring it up on the cash collateral hearing?

A We didn't have the papers to show you at the time.

Q Even though you believed at that point in time the bank didn't have a lien on 1986 ASCS payments, you sat back and let the Court go ahead and enter an order that said that they did?

A We had to have the money to go ahead and plant the crops. It was late. If we didn't get things right away, we weren't going to get the crops in at a timely fashion. We let it go, and at that time we set up for the adversary proceeding right then. We thought there was some problems with it.

Transcript at pp. 21–22.

Bankruptcy Rule 9024 incorporates Federal Rule of Civil Procedure 60, and makes that rule applicable in bankruptcy proceedings. Rule 60(b) sets forth six reasons justifying the setting aside of a final judgment or order. The debtors have not specified which of these six they are relying on. However, by their terms I believe that reasons 3, (fraud); 4, (void judgment); and 5, (satisfaction) are facially inapplicable because no facts have been pled or proven which would make them applicable. Therefore, we shall proceed under reasons 1, 2 and 6 which provide as follows:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

(6) any other reason justifying relief from the operation of the judgment.

Considering 60(b)(6) first, there was some indication in the pleadings that the debtors are proceeding under 60(b)(1), in that the failure to raise the issue of whether the Bank ever had a security interest in the ASCS payments was a mistake. The debtor testified that he doubted at the time of the April 28th hearing whether the Bank had such an interest, but that he wasn't sure until he got home that night and looked at the paper. Therefore, this case should be decided under either 60(b)(1) or (b)(2), not (b)(6), because (b)(6) is not a catchall. As the Sixth Circuit has observed,

Rule 60(b)(6) should be used only in exceptional or extraordinary circumstances and "can be used only as a residual clause in cases which are not covered under the first five subsections of Rule 60(b)."

*Miller v. Owsianowski (In re Salem Mortgage Company),* 791 F.2d 456, 459 (6th Cir.1986), quoting *Pierce v. United Mine Workers of America Welfare,* 770 F.2d 449, 451 (6th Cir.1985), *cert. denied,* 474 U.S. 1104, 106 S.Ct. 890, 88 L.Ed.2d 925 (1986).

As to (b)(2), it applies only when newly discovered evidence comes to light which could not have been discovered with due diligence in time to move for a new trial under Rule 59(b). This does not apply either. This is not "newly discovered" evidence; the debtor doubted whether the Bank had such a security interest during the day of April 28th, and assured himself of that on the evening of that day. That was certainly in time to make a motion under Rule 59(b), which is incorporated by Bankruptcy Rule 9023, and which gives 10 days from the entry of the judgment to file a motion for reconsideration or a new trial. As the Sixth Circuit said, "All of this clear-ly could have been discovered and submitted in time to move for a new trial." *Pierce,* 770 F.2d at 451.

Only 60(b)(1) is left. Of this provision the Sixth Circuit has written that:

It is well settled that the granting of a motion to set aside a judgment under Rule 60(b)(1) is a matter addressed to the sound discretion of the trial court, and that determination will not be reversed except for abuse of discretion. The burden is upon the appellant to bring himself within the provisions of Rule 60(b).

*Salem Mortgage,* 791 F.2d at 459. *Sales Mortgage* also cited *Blois v. Friday,* 612 F.2d 938, 940 (5th Cir.1980) favorably as follows:

Plaintiff's Rule 60(b) Motion must be equitably and liberally applied to achieve substantial justice. Doubt should be resolved in favor of a judicial decision of the merits of a case, and a technical error or a slight mistake by plaintiff's attorney should not deprive plaintiff of an opportunity to present the true merits of his claims. The countervailing factors are the defendants' and society's interests in the finality of judgments and the avoidance of prejudice. *Roberts v. Rehoboth Pharmacy Inc., supra,* 574 F.2d [846] at 847–48 [5th Cir.1978]; *Fackelman v. Bell,* 564 F.2d 734, 735–36 (5th Cir.1977). The plaintiff should not be punished for his attorney's mistake absent a clear record of delay, willful contempt or contumacious conduct. *Hassenflu v. Pyke,* 491 F.2d 1094, 1095 (5th Cir.1974).

791 F.2d at 459–460. However, the Sixth Circuit also quoted another case of its own favorably to the effect that "Rule 60 was not intended to relieve counsel of the consequences of decisions deliberately made, although subsequent events reveal that such decisions were unwise." *Federal's Inc. v. Edmonton Investment Co.,* 555 F.2d 577, 583 (6th Cir.1977). The Sixth Circuit distinguished *Salem* from *Federal's* because in *Salem* no deliberate choice was made. The counsel in *Salem* agreed to submit a case on briefs; one counsel submitted a brief addressing three issues on the same day he

signed a stipulation of facts which also limited the controversy to one issue. The Sixth Circuit held that to obviously be inadvertent.

Perhaps more on point is the case of *Kahle v. Amtorg Trading Corp.*, 13 F.R.D. 107 (D.N.J.1952), where the district court held that when a plaintiff holds a file of correspondence, gives only a part of that file to his counsel, and summary judgment is granted against the plaintiffs, the plaintiffs cannot then seek relief from that judgment in order to introduce other correspondence from the file on the grounds it had been omitted because the plaintiff mistakenly did not believe it relevant. The district court wrote that:

> The plaintiffs may not have been aware of the "importance or relevance" of the documentary evidence which they now offer, but this did not relieve them of the duty to make full disclosure to their attorney, who was competent to appraise the evidence. The course which they pursued was improvident but it was nevertheless intentional.

13 F.R.D. at 108. The District Court held that relief was not available under Rule 60(b)(1) "where, as here, the mistake was a mistake of judgment ascribable solely to the plaintiffs." *Id.* at 108–109. This is in accord with *Moore's Federal Practice*, which states of relief under Rule 60(b)(1) that, "Generally speaking a party who takes deliberate action with negative consequences, or who makes an informed choice as to a particular course of action will not be relieved of the consequences when it subsequently develops that the choice was unfortunate." 7 J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 60.22[2], at 60–182 (2nd ed. 1987).

Taking all of the above together, I believe this request for relief under Rule 60(b)(1) must be denied. In *Salem* the Sixth Circuit stated that even a liberal application of Rule 60(b) will not relieve a party from the consequences of an intentional decision. The distinguishing factor between *Salem* and other cases was the lack of a deliberate choice, which was made clear by the fact that the attorney in question submitted a brief contradicting the stipulation on the same day he signed the stipulation.

It is true that doubt should be resolved in favor of a judicial decision on the merits, and technical or slight errors should not prevent such a hearing. If this court were reconsidering a grant of summary judgment given on technical grounds, that precept would be more persuasive. But in this case we have already had a full hearing on the merits. The issue of that hearing was the Bank's alleged security interest in the debtors ASCS payments, and that was the sole issue. The debtor was the sole witness, and his own counsel was present. The debtor has now testified that at that hearing, and before that hearing, he did not believe the Bank had a security interest in the ASCS payments. He did not raise the question then, although he had the best opportunity in the world to do so. He explains this failure by saying that he didn't have the security agreement papers present at the hearing to show the Bank's counsel. I expect that someone at that hearing had a copy of those papers. But even if no one did, the debtor could have at least raised and reserved the issue. Nothing was said; his testimony makes it clear that the debtor deliberately decided not to say anything in order to hurry up the process so he could get the cash.

I would also note that the debtor was positive the Bank had no security interest in the ASCS payments on the night of the hearing, April 28, 1987; this does not square with the Complaint's allegations that this fact was "just discovered" by the debtors and their attorney when preparing a defense to an adversary proceeding complaint filed by the Bank against the debtors in July, 1987. Nor does the complaint square with the debtor's testimony that he informed his counsel of the Bank's lack of a security interest at his next meeting with his counsel after April 28th. In a bankruptcy case that has produced as much litigation as this one has, I doubt that the debtor did not meet with his counsel between April 28, 1987 and July of 1987.

Nor do I believe that the debtor has shown a meritorious defense. The "Business Loan Agreement" dated May 30, 1986, (Defendant's Exhibit A of March 31, 1988) clearly states at Section V, in part, that:

> As security for the Loan(s), Borrower will deliver to Bank the following documents of security, hypothecation or guarantee:
>> Security Agreement dated April 1, 1986, Security Agreement dated April 13, 1985, Life Insurance in the amount of $30,000.00, Assignment of ASCS crop payments, 90% FmHA Guaranty for term loan
>
> Bank and Borrower agree: (1) that all collateral shall secure all of the Borrower's indebtedness to Bank.

As I see it, this language, and the documents it refers to, give the Bank a security interest in the ASCS payments.

■ The May 30, 1986, Business Loan Agreement states that the "Borrower will deliver to Bank the following documents of security, hypothecation or guarantee: ... Assignment of ASCS crop payments." Read strictly, all we have here is an agreement by the debtor to execute an assignment to the Bank. However, it must be remembered that a security agreement need not be a separate document labelled as such. *In re Numeric*, 485 F.2d 1328, 1331 (1st Cir.1973). Any agreement which "creates or provides for a security interest," M.S.A. § 19.9105(1)(c) [M.C.L.A. § 440.9105(1)(c) ], is a security agreement. For that reason I have before held that a "security agreement must be a written bargain in language or implication which creates or provides for a security interest." *Shinville Associates, Inc. v. Miller Equipment Co. (In re Shinville Associates, Inc.)*, 46 B.R. 352, 356 (Bankr.W.D.Mich. 1985). In *Numeric* the First Circuit found that a board of directors' resolution directing the corporation clerk to prepare a financing statement, and the resulting financing statement, taken together, constituted a security agreement. The financing statement provided the collateral description and the board's resolution established that an agreement to give a security interest in fact existed. 485 F.2d at 1332. Here, the Business Loan Agreement constitutes a second security agreement inasmuch as it both describes the collateral, the ASCS crop payments, and establishes that the debtor in fact agreed to grant the Bank an assignment of the 1986[1] ASCS crop payments as security for the loan.[2]

1. The clear implication is that the debtors are to make out an assignment of their current (1986) ASCS crop payments and deliver that to the Bank. The assignment language could not refer to the 1985 ASCS crop payment, because the Bank already had a security interest in that under the April 13, 1985 security agreement which clearly stated under paragraph 3, entitled "Special Provisions," "Assignment of deficiency and diversion ASCS payments to Michigan National Bank." Nor do I think the Business Loan Agreement referred to ASCS payments of some year prior to 1985, nor of some year in the future.

2. Even if the Business Loan Agreement did not expressly grant the Bank a security interest in the 1986 ASCS crop payments, there are are at least three other ways by which the Bank might have attained such an interest. First, paragraph 3 of the April 13, 1985, security agreement grants an assignment of deficiency and diversion ASCS payments to the Bank in order to secure, as stated in paragraph 1 of that agreement, all loans and advances from the Bank to Borrower "of any kind and nature heretofore, now or hereafter owing from Borrower to Bank." In light of the fact that the assignment was to secure subsequent loans, I do not see why that assignment would necessarily have to be limited to the 1985 ASCS crop payments. Second, the April 13, 1985, Security Agreement specifically grants the Bank a security interest in contract rights, general intangibles and crops. I would think that a good case might be made that an ASCS payment must be either a contract right, a general intangible, or crop proceeds. The Bank has all three covered, and there is no language in the agreement limiting it to *1985* contract rights, general intangibles or crop proceeds. Third, not only does the Bank have contract rights, general intangibles and crops covered under the 1985 security agreement, but it also has them covered under the April 1, 1986, security agreement, and the same reasoning applies to 1986 as to 1985. *See FMB–First Michigan Bank v. Van Rhee*, 681 B.R. 1264, 6 U.C.C. Rep.Serv.2d 271, 274–276, (W.D.Mich.1987).

The parties have not addressed these arguments, so neither will I. I will note however, that under Rule 60(b) the burden is on the party seeking relief. Since these are all at least facially reasonable arguments which support the Bank's claims, and since the debtor has not even addressed them, let alone rebutted them, the debtor has failed to carry his burden, and fails

For this reason the parol evidence may not be admitted for to permit it into the trial would be to permit the debtor to deny the explicit terms of the agreement. Accordingly, as parol evidence is admissible only to clarify ambiguities and it is not admissible where it will have the effect of varying or contradicting the express terms of the instrument, I would hold all the parol evidence the debtors sought to admit to be inadmissible for the purpose of interpreting the contract. 39 Am.Jur.2d *Evidence* § 1040 (1967).

Even if I were to admit that evidence, however, I would not be persuaded that the debtors did not commit themselves to assign their 1986 ASCS payments to the Bank. The debtor has not explained why he signed the Business Loan Agreement, which provides for assignment of the ASCS payments, if he did not intend to give such assignments. Furthermore, the debtor did not testify that it had been agreed that the Bank would not get such an assignment. Instead, he merely testified that there had been no discussion of such an assignment in 1986, while in contrast it had been extensively discussed in 1985. (Transcript, pp. 20–21) At best, this testimony is inconclusive and carries no weight against the express terms of the contract. Not only are the debtor's memories of these events inconclusive, I would also disregard his testimony because I do not believe his subjective memory of these events is persuasive, especially when that memory is not corroborated by any other evidence, and when the debtor's other memories have proven so divergent from the paragraphs of his own complaint dealing with when he discovered that the Bank had no security interest and when he informed his attorney of this.

I would also note that the debtor repeatedly asserted during the hearing that not only did he not intend to grant the Bank an assignment of the 1986 ASCS payments, but that such a commitment was not contained in the 1986 loan papers. ("I knew that we had not discussed it, and there's nothing in the papers like '85, for it." Transcript at 21; "I know we never

irrespective of the language in the Business

discussed giving them ASCS payments in '86, but we did in '85. The '86 security agreements doesn't say it like it does in '85, and that was my understanding when I got the loan." Transcript at 22.) The debtor's attorney argued for the admission of parol evidence on the ground that the security documents were ambiguous in that a security interest in ASCS payments is not clearly granted in the documents. The debtor's attorney said,

I don't believe the documents are clear on its (sic) face. If, in fact, the bank claims an interest in the ASCS payments or if, in fact, the bank claims a security interest in any crop insurance payments from 1986, I think they are ambiguous. It is not clear that they clearly grant a security interest. They are not covered in the specific language in either paragraph 1 and paragraph 2, which is the grant and the description of the collateral and as a result of whether or not there is a security interest, I believe, they are ambiguous (sic).

Transcript at 14–15. However, in evaluating these statements it must be noted that at the time they were made only one 1986 security agreement had been introduced, that of April 1, 1986. There were *two* security agreements in 1986, however, and the second one, the Business Loan Agreement of May 30, 1986, clearly mentioned an assignment of the ASCS payments, The debtors never addressed this security agreement of May 30th, which was only introduced by the Bank later in the trial.

Of course, the debtors have no obligation to make the Bank's case for it. Nevertheless, they do have an obligation to be honest with the court. To unqualifiedly say that no 1986 security agreement expressly mentioned the assignment of ASCS payments would be to mislead the court. The court would prefer to assume that in making these statements the debtors and their counsel made a silent qualification limiting their broad statements to only those exhibits already introduced. Assuming such a limitation, the debtors' parol evidence is relevant only to interpreting the April 1,

Loan Agreement.

1986, security agreement, which is not in issue here, and irrelevant to the May 30, 1986, security agreement, which is in issue.

■ The debtors have also argued that even if the May 30th Security Agreement did give the Bank a security interest in the ASCS payments, that interest would be void as violative of a proposed federal regulation which was pending at the time and which prohibited the taking of security interests in ASCS payments. 12 C.F.R. § 770.4(b)(1) and (2). Nothing in that regulation states whether it is prospective only in application. Conversely, it does not on its face require retroactive application. The regulation did not become effective until October 16, 1986, after the Bank took its security interest under the May 30th agreement. The Bank argues that this regulation should not be given retroactive effect for such a step would be an unconstitutional taking of its property. The debtors argue that prior to May 30th interim regulations made the same point. *See In re Lehl,* 79 B.R. 880 (D. Nebraska 1987). That is true; however, the interim rules were not final until October 16, 1986. *Id.* at 882. Until that time they were merely proposals subject to public comment, and possible alteration. To give the final regulation effect before it was effective because it was published as a proposal would be absurd; it would make all proposals into rules. It might be permissible to give a law which is set to become effective upon a date in the future a retroactive application at least from its effective date to its promulgation date because the law is final and set as of its promulgation date. The same cannot be said of this proposed and final regulation. Under *United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982) I must apply this regulation prospectively only.[3]

Returning to the other factors that the Sixth Circuit has listed as governing whether or not to grant relief under Rule 60(b)(1), the next factor is prejudice to the nonmoving party. The court would note that it is the movant's burden to affirmatively demonstrate the lack of such prejudice. The debtors here have not expressly done so. However, it might be inferred from their argument that it cannot harm the Bank to take away from it a replacement lien for which no original lien existed. As explained above though, I believe the Bank did indeed have a security interest in the 1986 ASCS payments. To take the replacement lien away would be to allow the debtor to use the Bank's cash collateral without affording the Bank the adequate protection mandated by the Bankruptcy Code.

The last factor to consider is the interest of society and litigants in final judgments. The debtor now states that even as he sat before this Court on April 28, 1987, he believed the Bank had no security interest in his ASCS payments, yet he said nothing. He testifies now that on the night of April 28, 1987, he assured himself that the Bank had no interest and that he told his attorney this when next they met, which presumably would be soon afterward. (Notwithstanding any contrary implication which might be found in paragraph 13 of the complaint.) Yet they did nothing about this until November 17, 1987. It is true that under Rule 60(b), a party has up to one year to bring a motion under 60(b)(1). However, the exact language of 60(b) says that the motion "shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than one year after the judgment, order or proceeding was entered or taken." A delay from April to November is not reasonable when the moving party has all the documents in his possession and has had a full hearing on the issue in that time. A party cannot sit on his evidence and release it to the court in bits and pieces as it pleases him to do so. A party should not withhold the full truth from the court, especially when that party is testifying.

---

**3.** Given that I do not believe the regulation is applicable, I need not reach the Bank's argument based on *In re George,* 5 U.C.C.Rep.Serv.2d 1117 (Bankr.D.Kan.1988), that the regulation itself is invalid in that it exceeds the authority delegated to the Secretary of Agriculture by Congress. *See, FMB–First Michigan Bank v. Van Rhee,* 681 B.R. 1264, 6 U.C.C. Rep.Serv.2d 271, 276–277 (W.D.Mich.1987).

Indeed, I believe the debtor is estopped by his silence from bringing this proceeding. Granted, I do not believe the "evidence" and arguments the debtor has now brought forth would have changed the result one bit. Even if they would have changed the result, I would have a very hard time seeing how I could now rule in favor of a party who deliberately withheld issues when he had a full opportunity to raise them. The principles of estoppel forbid the court from allowing one who mislead the court to now confess that sin and more, to profit by it.

A party who discovers a mistake should not be able to elect between relief under Rule 59 and Rule 60; if a party discovers a mistake the night after a hearing they should proceed immediately to move for reconsideration within 10 days To allow relief here would be to make judgments into toys. Orders must be final or they are not orders.

For all the above reasons the court denies the debtors' request for relief under Rule 60(b).