**IN RE LEVITZ INSURANCE
AGENCY, INC., Debtor.**

**IN RE HAROLD B. LEVITZ, Debtor.**

**Howard B. LEVITZ, Plaintiff,**

v.

**ARONS ARCADIA INSURANCE
AGENCY, INC., Defendant.**

Bankruptcy Nos. 92–19786–
JNF, 92–19787–JNF.
Adv. No. 92–1702.

United States Bankruptcy Court,
D. Massachusetts.

Dec. 11, 1992.

**694**

Victor G. Millione, Boston, MA, for debtor/plaintiff.

Nina M. Parker, Boston, MA, for defendant.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matter before the Court for determination is the "Application of Arons Arcadia Insurance Agency, Inc. ("Arons") for Accounting and Segregation of Cash Collateral and to Prevent Use Thereof" (the "Application"). The Application was filed in both the above referenced Chapter 11 cases.

Levitz Insurance Agency, Inc. ("LIAI") and Howard Levitz ("Levitz") (collectively "the Debtors") opposed Arons' Application. Levitz also filed an adversary complaint to avoid the security interest asserted by Arons. The Court consolidated the adversary proceeding with the contested matter.

The parties have submitted an Agreed Upon Statement of Facts with exhibits attached and memoranda of law. No material facts are in dispute.[1] Based upon the undisputed facts as set forth in the Agreed Upon Statement of Facts and attached exhibits, the Court makes the following findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## II. FINDINGS OF FACT

From 1984 to 1991, Levitz was an insurance salesman employed by Arons. On October 28, 1986, Arons and Levitz entered into a so-called Equity Agreement (the "Agreement"). The Agreement provided that each owned 50% of the "Book of Business" of Arons, which was defined as business generated and/or developed by Levitz and designated in agency records as "L6" and "HA". In the event of Levitz's termination, the Agreement gave Levitz an option to purchase Arons' one-half interest in the Book of Business at a price to be established by formula, payable in sixty monthly installments to be evidenced by a promissory note. In May 1991, Levitz gave Arons notice of his voluntary termination and exercise of the option.

On June 26, 1991, Arons and Levitz executed a Purchase and Sale Agreement ("the P & S"). Paragraph 1 of the P & S provided that Arons would sell to Levitz the following assets:

> The complete and entire customer list, all expirations, expiration files and customer account records used by the Seller in

---

1. Arons attempted to submit an affidavit through which it sought to establish the interchangeability of certain terms frequently used in the insurance business. Upon the Debtors' timely motion, the Court struck the affidavit. At the hearing on the Applications, the parties also requested that the Court determine the amount owed to Arons, in light of asserted credits owed to Levitz. However, the parties failed to submit any facts on this issue in the Agreed Upon Statement of Facts. The Court makes no findings with respect to the amount owed to Arons.

connection with the Book of Business including therewith all underwriting and claim files, together with all other usual and customary records in connection therewith, which assets are more specifically identified on the Schedule of Accounts annexed hereto, marked *EXHIBIT A:* the accounts so identified on said Schedule of Accounts ... constituting all of the insurance accounts owned by the Seller relating to the Book of Business; provided; however, to the extent that any insurance account owned by the Seller which comprise the Book of Business is not set forth on EXHIBIT "A", such account shall, nevertheless, be subject to this Agreement and transferred to the Buyer hereunder.

(emphasis added). In addition, the P & S provided that Levitz would buy Arons' rights to use telephone and telecopier numbers and a post office box.

Exhibit A referred to in the P & S was entitled "Receipt for Schedule of Accounts Pursuant to Section 1(a)." [2] It contained a nineteen page "Book of Business Report" dated May 26, 1991, setting forth customer numbers, names, policy numbers and certain unidentified codes. Paragraph 5 of the P & S provided that Levitz would grant Arons a security interest in and to the Book of Business, which would be evidenced by a security agreement and financing statement. Arons gave Levitz a Bill of Sale dated September 24, 1991 that acknowledged the transfer by Arons to Levitz of the following:

The complete and entire customer list, all expirations, expiration files and customer account records used by the SELLER in connection with the Book of Business including therewith all under-writing and claims files, together with all other and usual and customary records in connection therewith, which assets are more specifically identified on the Schedule of

Accounts annexed hereto, marked *EXHIBIT "A".*

(emphasis added). The Exhibit A referenced in the Bill of Sale is the identical Exhibit A annexed to the Purchase and Sale Agreement.

In conjunction with the sales transaction, Levitz executed both a promissory note to Arons entitled "Secured Term Note" (the "Note") and a letter granting Arons a security interest in certain collateral. The Note dated September 24, 1991 was in the principal amount of $358,684.53, payable in sixty installments of $7,028.42 each. The Note stated that Levitz's obligations were secured by "[t]he 'collateral' of the undersigned defined in the certain Security Agreement of even date...." The Note also recognized Levitz's right to set off bonuses due him from Arons against his obligations under the Note.

The letter executed by Levitz on September 24, 1991 was acknowledged as accepted by Arons. In pertinent part, the letter provided the following:

To secure the due payment and performance of all of the obligations hereunder of the undersigned, herein called "Borrower" to Arons Arcadia Insurance Agency, Inc., a Massachusetts corporation, herein called "Secured Party", and the obligations of Borrower to Secured Party pursuant to that certain Secured Term Note of the undersigned of even date herewith in the principal face amount of $348,684.53, all hereinafter called "Obligations", the Borrower hereby grants to Secured Party a continuing security interest in the customer list annexed hereto as Exhibit "A" and incorporated herein by reference (the "Collateral").

The Collateral and all proceeds and products thereof shall be security for all Obligations. Until all Obligations have been fully satisfied, Secured Party's security interest in the Collateral and all proceeds

---

**2.** Exhibit A further provided:

Reference is hereby made to a certain Purchase and Sale Agreement dated effective as of June 26, 1991, by and between [Arons] and [Levitz] concerning the sale of assets of [Arons].

Attached is a separate Schedule of Accounts delivered by the Seller pursuant to section 1(a) of the aforesaid Purchase and Sale Agreement.

and products thereof, shall continue in full force and effect.

Exhibit A to the letter agreement is the same as Exhibit A attached to both the P & S and the Bill of Sale.

LIAI executed and delivered to Arons a Corporate Guaranty dated September 24, 1991 by which LIAI guarantied Levitz's payment of the Note to Arons and his performance of the terms and conditions of the P & S. Moreover, as part of the sales transaction, LIAI acknowledged "the assignment and assumption by LIAI of the accounts constituting the Book of Business" and its joint and several liability to Arons for Levitz's obligations. Thus, Levitz executed UCC–1 financing statements, both individually and on behalf of LIAI, listing Arons as a secured party. The financing statements described the collateral as follows:

"That Schedule of Accounts delivered by the Secured Party to the Debtor pursuant to a certain Purchase and Sale Agreement dated effective as of June 26, 1991 by and between Arons Arcadia Insurance Agency, Inc. and Howard B. Levitz and Levitz Insurance Agency, Inc."

On April 24, 1992, Arons notified Levitz of an alleged default under the Note. Arons commenced a civil action in Suffolk Superior Court for breach of the Note obligations and to enforce the security agreement. Pending an arbitration decision, the state court ordered that installment payments due under the Note were to be placed in escrow. The August payment was placed in escrow, however, no further payments were made. Both Debtors filed voluntary Chapter 11 petitions on September 24, 1992.

## III. DISCUSSION

### A. *Arons' Arguments*

Arons argues that it has a valid and enforceable security interest in both Debt-

ors' "Book of Business", which it contends includes the customer list, insurance expirations, customer insurance accounts, records, and all business generated by the Debtors. Arons submits that the financing statements' description of the collateral as "Schedule of Accounts" is sufficient to identify the Book of Business as the subject collateral. Accordingly, Arons seeks to prohibit the Debtors from using revenues generated by the Debtors on the ground that the income constitutes cash collateral. *See* 11 U.S.C. §§ 363(a) and (c)(2)(B).

### B. *Debtors' Arguments*

The Debtors claim that Arons has no security interest in the accounts of LIAI because LIAI did not sign any document purporting to be a security agreement. They assert that any security interest that Arons obtained in Levitz's collateral is unperfected because the financing statements do not identify the customer list as collateral and refer only to the Schedule of Accounts. Alternatively, they claim that the security interest obtained is limited to the customer list, which, in their view, does not implicate section 363 of the Bankruptcy Code since it generates no income in and of itself. Accordingly, the Debtors submit that Arons is a general unsecured creditor of the Debtors due to the invalidity of its security interest.

### C. *Issues*

The arguments of the parties narrow the issues before the Court to the following: 1) What was the extent of the security interest granted to Arons by Levitz? 2) Was the security interest obtained properly perfected as to any or all assets of Levitz or LIAI so as to implicate the cash collateral provisions of the Bankruptcy Code? and 3) Does Arons have a properly perfected security interest in any assets of LIAI? [3]

---

**3.** Ownership of the collateral that is the subject of Arons Applications is unclear. Although the letter from LIAI to Arons dated September 24, 1992 suggests that Levitz assigned the assets he purchased from Arons to his corporation, the Court lacks a bill of sale or an assumption and assignment agreement between Levitz and LIAI. Moreover, the letter itself only refers "the assignment and assumption by LIAI of the *accounts* constituting the Book of Business" (emphasis supplied).

## IV. CONCLUSIONS OF LAW

 The nature, extent, and validity of Arons' interest in the Debtors' assets must be determined in accordance with state law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Under Massachusetts law, the creation of a security interest requires a security agreement that describes the collateral. M.G.L. c. 106, § 9–203(1). A security interest attaches only to the property described in the security agreement. *In re Nightway Transp. Co., Inc.,* 96 B.R. 854 (Bankr. N.D.Ill.1989). There is no requirement that the agreement be entitled security agreement to be enforceable as long as it evidences an intent to create a security interest. *In re Sportsland, Inc.,* 17 U.C.C.Rep.Serv. 1333 (Bankr.D.Mass.1975). Indeed, the security agreement may consist of several documents. *Baystate Drywall, Inc. v. Chicopee Savings Bank,* 385 Mass. 17, 429 N.E.2d 1138 (1982). The description is sufficient if it "reasonably identifies what is described." M.G.L. c. 106, § 9–110. As one commentator has stated:

> The security agreement's collateral description sets the outer limits of collateral coverage. No matter how broad the financing statement language, the security interest extends no further than the security agreement description. As opposed to the financing statement, it should go beyond the statutory test of reasonable identification and contain as precise a description of collateral as possible.
>
> A failure to list any collateral is, of course, fatal, and the parol evidence rule will prohibit adding neglected items, even if the items were included in all other loan documents.

William C. Hillman, *Documenting Secured Transactions* 17–1–2 (5th ed. 1992) (footnotes omitted). A financing statement's description of collateral cannot enlarge the extent of a security interest. *In re Sportsland, Inc., supra.* Where a security agreement covers only certain assets, the financing statement's inclusion of additional assets is ineffective to create a security interest in the additional assets omitted from the security agreement. *Mitchell v. Shepherd Mall State Bank,* 458 F.2d 700 (10th Cir.1972).

 In light of these principles, the Court finds that the security interest Levitz granted to Arons was intended to cover the customer list and not accounts. The P & S refers to the customer list, all expirations, expiration files, customer account records, underwriting and claim files and other usual and customary records. Accordingly, the parties appear to be attempting to deal with two types of collateral— accounts [4] and general intangibles.[5] However, based upon the letter security agreement's language ("the Borrower hereby grants to Secured Party a continuing security interest in the customer list annexed hereto as Exhibit A and incorporated herein by reference"), it is clear that Levitz signed a security agreement granting Arons a security interest limited to the customer list. The agreement refers only to the customer list as collateral, not accounts. The P & S does not help as it does not provide for the creation of a security agreement. Rather, it merely contemplates that a security agreement shall be executed in the future. *See* William C. Hillman, *supra* at 4–6 n. 27 and cases cited therein. None of the other documents provide a different description of the collateral.

Accordingly and in view of Levitz's payment of several of the monthly installments due under the Note, the Court shall, for purposes of this opinion, consider Levitz the owner of the customer list, particularly as his Schedule D identifies Arons as the holder of a secured claim against the customer list. The Court notes, however, that Levitz's schedules fail to list is 60% ownership interest in LIAI, highlighting the confusion as to the ownership of Arons' former assets.

4. An account is defined as "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance." M.G.L. c. 106 § 9–106.

5. General intangibles are "any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money." M.G.L. c. 106 § 9–106.

■ Arons contends that since the financing statements refer to the Schedule of Accounts, LIAI's accounts receivable are subject to its security interest. However, neither "customer list" nor insurance expiration files can be considered a "right to payment for goods sold or leased or for services rendered." They are simply not included within the definition of accounts. *In re Davies Ins. Service, Inc.*, 33 B.R. 252 (Bankr.W.D.PA.1983) (insurance expirations are most properly categorized as general intangibles). The financing statements' purported expansion of the collateral description to accounts is ineffective, where the security agreement unequivocally provides for a security interest in the customer list only. A financing statement is not a substitute for a security agreement that satisfies the requirements of 9–203(1)(b) of the Uniform Commercial Code. *In re Numeric Corp.*, 485 F.2d 1328 (1st Cir.1973); William C. Hillman, *supra*, at 4–4. Moreover, it is questionable at best whether Levitz transferred the customer list to LIAI, and even if he did, Arons' security interest would not extend to LIAI's accounts in the absence of a signed security agreement granting it a security interest in them. Accordingly, Arons' argument is without merit.

■ Next, it must be determined whether Arons' security interest in the customer list was perfected by the filing of a proper financing statement. In this regard, it is important to keep in mind that

> [t]he primary function of 9–203 is that of a statute of frauds; it is designed mainly to minimize disputes over whether there was an agreement and over what collateral it could have covered. The primary function of the description in 9–402 is to put third parties on notice. In the view of some, tests for acceptable descriptions under the two sections differ because the functions of the sections are different; the tests may also differ because 9–402(8) explicitly validates a financing statement although it "contains minor errors which are not seriously misleading." Section 9–203 does not include a similar validation proviso with respect to defects in a security agreement.

2 James J. White & Robert S. Summers, *Uniform Commercial Code* 305–306 (3rd ed. 1988) (footnote omitted).

■ A financing statement must contain either a statement indicating the types of or describing the items of collateral. M.G.L. c. 106 § 9–402(1).

> "The description of collateral in a financing statement need not be specific or exact as long as it reasonably identifies the type of property in which a security interest has attached … It is sufficient if it provides enough information to put a person on notice of the existence of a security interest in a particular type of property so that further inquiry can be made about the property subject to the security interest."

*Heights v. Citizens Nat'l Bank*, 463 Pa. 48, 58–59, 342 A.2d 738 (1975). A financing statement that substantially complies with Section 9–402 is effective if it contains errors which are not seriously misleading. M.G.L. c. 106 § 9–402(8).

■ In the present case, the UCC–1 financing statements filed by Arons refer to an attached list of customers, containing customer and policy numbers. Thus, it reasonably identified the customer list that served as the collateral. That the financing statements' exhibits were entitled a "Schedule of Accounts" must be considered a minor error that is not seriously misleading, because the list attached contained all the information about the customer list that a third party could possibly want to know. However, the references in Exhibit A attached to the financing statements, which in turn refer to the exhibit to the P & S, fail to put third parties on notice that any assets in addition to the customer list serve as the collateral. This is because the so-called Schedule of Accounts that is part of Exhibit A is nothing more than a coded list of customers and policy numbers.

The remaining question is whether Arons has a security interest in LIAI's accounts as that term is defined in Massachusetts' version of the Uniform Commercial Code. Clearly, it does not. Since the security agreement between Arons and Levitz is

limited to the customer list and does not extend to accounts, Levitz's assignment of "the accounts constituting the Book of Business" to LIAI is insufficient to provide Arons with a security interest in LIAI's accounts.

## V. CONCLUSION

With respect to Levitz's complaint, the Court rules that based upon the evidence before it Arons has a valid security interest in the customer list that belongs to Levitz. To the extent that the customer list belongs to LIAI, LIAI obtained that asset subject to Arons' security interest in it.

■ With respect to the Applications, Arons' security interest is limited to the customer list attached to the financing statement. Customer lists are not "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents ... [or] ... the proceeds, products, offspring, rents, or profits of property subject to a security interest...." *See* 11 U.S.C. § 363(a). Accordingly, Arons' Applications are denied as it is not entitled to adequate protection of its security interest in the customer list as cash collateral. Indeed, Arons concedes that without the expirations and accounts the customer list is valueless. While the Court does not necessarily agree that that is the case, certainly the Debtors are correct when they state the customer list, unlike commission income which can properly be categorized as accounts, does not generate proceeds that would constitute cash collateral. An appropriate order shall issue.