**In re William Earl MADDOX, Individually and d/b/a Wemco and Wemco Services, Debtor.**

**William Earl MADDOX, Individually and d/b/a Wemco and Wemco Services, Plaintiff,**

**v.**

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of National Bank of Texas, Defendant.**

Bankruptcy No. 87–11032–K.
Adv. No. 88–1040.

United States Bankruptcy Court,
W.D. Texas,
Austin Division.

Nov. 4, 1988.

Charles E. Hampton, Austin, Tex., for debtor.

Adam I. Hauser, Austin, Tex., for defendant.

## MEMORANDUM OPINION

LARRY E. KELLY, Chief Judge.

This adversary proceeding was commenced by the complaint of the Chapter 13 Debtor, William Earl Maddox, ("Maddox"). The complaint seeks to determine the validity of an alleged security interest of the defendant Federal Deposit Insurance Corporation ("FDIC"). It is based upon the lack of a document specifically denominated "Security Agreement" or any single document which contains language by which Maddox expressly grants a security interest. The principal issue therefore is whether the security agreement or granting language can be found by "necessary implication."

The case was argued to the Court on September 19, 1988 and has been extensively briefed by the parties. All facts have been stipulated except the question of mixed fact and law as to whether the language of the documents signed by the debtor taken together are sufficient to es-tablish the existence of a security agreement under TEX.BUS. & COM.CODE § 9.203(a)(1) (Vernon 1988). We rule in favor of the FDIC on this ultimate question. We set forth here our Findings of Fact and Conclusions of Law.

## I. FACTS

Maddox began the process of obtaining from National Bank of Texas a 90% guaranteed SBA (Small Business Administration) loan on November 29, 1985 by submitting a Business Loan Application. Various exhibits and attachments within this application were signed by Maddox. Once a decision was made by the National Bank of Texas, Austin, Texas (hereafter "the Bank") to grant an SBA loan to Maddox, Maddox signed on March 18, 1986 (i) a promissory note in the original face amount of $52,000.00 (hereafter "Note"), (ii) an Authorization and Loan Agreement (hereafter "Loan Agreement") and a Lessor's Agreement between Maddox as lessee and Michael Kelch as lessor (hereinafter "Lessor's Subordination Agreement"). On March 19, 1986 Maddox signed and delivered to the Bank a UCC–1 Financing Statement (hereafter "UCC–1"). On May 27, 1986 Maddox signed and delivered to the Bank a Resolution of Corporate Board—Authority to Procure Loan (hereafter "Corporate Resolution"). No separate document entitled "Security Agreement" was ever signed by Maddox with the intent to grant a security interest to the Bank by that single document. The parties have agreed and stipulated that if the existence of a security agreement cannot be determined from the above-listed documents, none exists.

With regard to the subjective intent of the parties at the time of the execution of the above-listed documents, the parties have stipulated as follows:

1. At the time of the loan Maddox understood the loan to be secured.

2. To obtain the loan Maddox intended to comply with the requirements of the Bank and the SBA by granting a security interest in the collateral described on the UCC–1.

The Note was funded only to the extent of $49,814.26. At some point prior to June, 1987, the National Bank of Texas, Austin, Texas failed, and the FDIC as receiver became its successor in interest. The FDIC is the legal owner and holder of the Note and the security interest securing same.

On June 2, 1987, Maddox filed for protection under Chapter 13 of the Bankruptcy Code. On February 16, 1988 Maddox filed the Adversary Proceeding now before the Court to determine the validity of FDIC's security interest.

There is no dispute as to the following requirements of TEX.BUS. & COM.CODE § 9.203, and the Court finds and rules that (i) value had been given by the Bank in the amount of $49,814.26 and (ii) at all relevant times Maddox owned the collateral and had rights in it.

The language from the loan documents relied upon by the parties which evidence the existence of a security agreement is as follows:

PROMISSORY NOTE:

The Collateral, and each part thereof, shall secure the indebtedness and each part thereof. The covenants and conditions set forth or referred to in any and all instruments of hypothecation constituting the Collateral are hereby incorporated in this Note as covenants and conditions of the undersigned with the same force and effect as though such covenants and conditions were fully set·forth herein. page 1

Upon the non-payment of the indebtedness, or any part thereof, when due, whether by acceleration or otherwise, Holder is empowered to sell assign and deliver the whole or any part of the Collateral at public or private sale.... [continues with extensive list of holder's rights with regard to the collateral] ... page 2

LOAN AGREEMENT

3. Terms of Loan ...
   c. *Collateral:*
1. First lien evidenced by Security Agreement(s) and UCC–1 filing(s) on all

a. equipment (excluding titled motor vehicles)
b. inventory
c. accounts receivable now owned and hereafter acquired.
2. Prior to first disbursement the appropriate UCC lien searches must be made to determine Lender's priority of lien.

UCC–1

Describes parties as "debtor" and "secured party". Contains a complete description of all collateral.

LESSOR'S SUBORDINATION AGREEMENT

Lessor subordinates to all liens securing the note, until payment in full, every lien or claim against any or all of the property hypothecated as collateral for the indebtedness in favor of "Bank/SBA" hereinabove referred to.

CORPORATE RESOLUTION

No copy provided to Court.

II. DISCUSSION OF LAW

The sections of the Texas version of the Uniform Commercial Code that govern the Court's opinion are:

1. § 9.203(a)(1) which described the formal requisites of a security agreement;

2. Comments 1 and 5 to § 9.203 which elaborate on the purpose and function of the formal requisites of § 9.203(a)(1);

3. § 9.105(a)(12) which defines a security agreement;

4. § 1.201(3) which defines "agreement"; and

5. § 9.402 which states that a security agreement can be a financing statement.

■ The only requirements for the enforceability of a non-possessory security interest are (a) a writing, (b) the debtor's signature, and (c) a description of the collateral. TEX.BUS. & COM.CODE § 9.203(a)(1) and Comment 1 thereto. Ap-

plying the plain meaning of the statute it would appear that here an enforceable security interest was created. Unfortunately, one of the first courts to interpret this section enunciated what has come to be known as the "express grant rule." *American Card Company v. H.M.H. Co.*, 97 R.I. 59, 196 A.2d 150 (1963). In that case the court examined a standard form UCC statement alone which the lender asserted was sufficient of itself to constitute a a security agreement. The *American Card* court applied the Rhode Island version of (i) U.C.C. § 9–203 setting forth the formal requirements for a security agreement and (ii) U.C.C. § 9–402 which states that some security agreements are sufficient as a financing statement if filed. It concluded that a financing statement, absent an agreement therein, cannot be treated as the equivalent of a security agreement. At one point, the court expresses this holding as "[S]ince the financing statement filed here contains no such grant [i.e., debtor's grant of a security interest] it does not qualify as a security agreement." *American Card Company v. H.M.H. Co.*, 97 R.I. 59, 196 A.2d 150 (1963).

Most commentators and many courts, even those which have not followed *American Card*, have taken the holding of this case to mean that no financing statement can serve as a security agreement and that there must be a document in which debtor *expressly* grants a security interest. Grant Gilmore writes in his classic work on security interests:

> In *American Card Co. v. H.M.H. Co.*, the discrepancies between § 9–203 and § 9–402 led the Rhode Island court to an unfortunate decision. To secure a debt, H.M.H. agreed to give the card company a security interest in certain tools and dies. The card company filed a financing statement which complied in all respects with the § 9–402 requirements. In an equity receivership, the card company was denied status as a secured creditor on the ground that the debtor had not signed a "security agreement" in addition to the financing statement. The court noted that a security agreement, if executed, could have been filed as a fi-

nancing statement (if it met the additional requirements of § 9–402) but concluded that the reverse was not true: "it is not possible for a financing statement which does not contain the debtor's grant of a security interest to serve as a financing statement." Certainly, nothing in § 9–203 requires that the "security agreement" contain a "granting" clause. The "9–402 financing statement contained all that was necessary to satisfy the § 9–203 statute of frauds as well as being sufficient evidence of the parties' intention to create a security interest in the tools and dies. No doubt the court would have upheld the security interest if the debtor had signed two pieces of paper instead of one. The § 9–402 provision that a short financing statement may be filed in place of the full security agreement was designed to simplify the operation. The Rhode Island court gives it an effect reminiscent of the worst formal requisites holding under the nineteenth century chattel mortgage acts. GRANT GILMORE, SECURITY INTERESTS IN PERSONAL PROPERTY § 11.4 (1965).

In fact, the holding of *American Card* need not be read so broadly. The *American Card* court merely held that *some* financing statements (those in which "nowhere in the form is there any evidence of an agreement") are not sufficient as security agreements, not that no financing statement can ever be sufficient as a security agreement. *American Card, supra.*

■ In this case, we have before the court not a mere standard form UCC statement, but several documents from which the FDIC urge us to find "evidence of an agreement". As pointed out by the FDIC, the composite document rule is the rule in most circuits which have addressed this question. *Matter of Miller*, 545 F.2d 916 (5th Cir.1977); *Matter of Numeric Corp.*, 485 F.2d 1328 (1st Cir.1973); *Matter of Bolinger Corporation*, 614 F.2d 924 (3rd Cir.1980) (a well reasoned opinion which surveys and attempts to reconcile the existing law on the subject); *Matter of Wambach*, 484 F.2d 572 (7th Cir.1973); *In re*

*Amex Protein Development Corp.*, 504 F.2d 1056 (9th Cir.1974). Contra *Shelton v. Erwin*, 472 F.2d 1118 (10th Cir.1973) (some grant language is necessary to "create or provide security").

The Composite Document Rule is that there need not be a separate document labeled "Security Agreement" but rather all relevant loan documents may be examined to determine whether a security *agreement* exists, i.e., a security *interest* has been granted. An often unstated corollary to the Composite Document Rule is that the "evidence of agreement" can be that the documents examined would not have been written, signed or worded as they are unless a security interest was granted. That is, a security agreement is found by necessary implication rather than by express grant. The Ninth Circuit has found sufficient evidence of a security agreement by the mere fact that a sufficient financing statement is prepared, signed by the debtor and filed. After all, why would a debtor and lender go to the trouble to perfect a security interest that had not been created? *In re Amex–Protein Development Corp.*, supra. The First, Third, Fifth, and Seventh Circuits have taken the middle ground and required more evidence from other documents but no formal words of grant. The Fifth Circuit has stated:

> The principal test for determining whether a transaction is to be treated as a security interest is: "[I]s the transaction *intended* to have effect as security?" *Id.* § 9.102 (Comment 1 [to U.C.C. § 9–102], emphasis added). No formal wording is required; we are to examine the substance of the documents, in light of the circumstances of the case. *Matter of Miller*, 545 F.2d 916 (5th Cir.1977).

Maddox cites a Texas case, *Mosley v. Dallas Entertainment Company, Inc.*, 496 S.W.2d 237 (Tex.Civ.App.—Tyler 1973, writ dism'd) for the proposition that no grant of a security interest may be found by implication. *Mosley* is not controlling, however, for three reasons. First, in *Mosley* the creditor argued that a standard form UCC–1 financing statement alone was a sufficient security agreement. The Court found the UCC–1 insufficient be-cause it "fails to contain any language showing the alleged debtor granted the creditor (appellee) an interest in the collateral," *Mosley, supra* 240. The situation here is factually distinguishable since more documentation than a mere UCC–1 exists. Second, Maddox reads the holding of *Mosley* too broadly. As in *American Card,* the court held that the evidence before it (a standard form UCC statement) contained insufficient evidence of a security agreement, not that the grant of a security interest can never be determined by necessary implication. Third, the creditor in the *Mosley* case attempted to prove the existence of a security by oral testimony. This the court properly refused to allow. *Mosley, supra* at 240. As stated by comment 5 to U.C.C. § 9–203:

> 5. The formal requisites stated in this Section are not only conditions to the enforceability of a security interest against third parties. They are in the nature of a Statute of Frauds. Unless the secured party is in possession of the collateral, his security interest, absent a writing which satisfies subsection (1)(b), is not enforceable even against the debtor, and cannot be made so on any theory of equitable mortgage or the like.

Maddox also cites the case of *Martin Grinding & Machine Works,* 793 F.2d 592 (7th Cir.1986) for the proposition that neither oral *nor* written evidence outside a formal security agreement can be used to expand the scope of the interest actually granted in a formal written signed security agreement (which both parties concede is missing entirely in this case). Here Maddox demonstrates either disingenuousness or an understandable confusion between the Statute of Frauds and the Parol Evidence Rule. The parol evidence rule applied in *Martin Grinding* does not allow oral evidence or prior written evidence to vary the terms of a written agreement which the court has determined the parties intended as the full and final expression of their agreement. In *Martin Grinding* there was a written security agreement granting a security interest in four broad categories (machinery, equipment, furni-

ture, fixtures). The financing statement covered these categories *and* inventory and accounts receivable. Because of the parol evidence rule, the written financing statement could not be used to vary the terms of the written security agreement. *Martin Grinding & Machine Works,* 793 F.2d 592 (7th Cir.1986). In the case before the Court, there is no single written agreement which the parties intended as the full and final expression of their agreement. Thus *Martin Grinding* and the parol evidence rule are inapplicable.

It is evident that no conditions are imposed on the security agreement other than it create a security interest. The definition of agreement provided by the Uniform Commercial Code as enacted by Texas provides additional guidance for establishing the existence of an agreement in this case:

"Agreement" means the bargain of the parties in *fact as found in their language or by implication from other circumstances* including course of dealing or usage of trade or course of performance as provided in this title (Sections 1.205 and 2.208). Whether an agreement has legal consequences is determined by the provisions of this title, if applicable; otherwise by the law of contracts (Section 1.103). (emphasis added).

The statute of frauds, as applied in *Mosley* is applicable. *Mosley* correctly held that parole evidence is not admissible to vary the terms of a written financing statement (which terms in that case were not sufficient to evidence the existence of a security agreement). However, *Mosley* is not inconsistent with the application of the Composite Document Rule. In this case the Court has been presented with several written documents from which the FDIC asks it to glean evidence of the existence of a security agreement. On the basis of the foregoing Findings of Fact and Conclusions of Law it is the decision of this Court that there is sufficient evidence in these written documents of the existence of a security agreement and that such an agreement exists, is enforceable against the debtor and is enforceable against third parties due to its perfection on March 19, 1986.

A separate judgment of even date has issued affirming the FDIC's security interest in the property of the debtor, Maddox described in the UCC–1 filed March 19, 1986.