sion within ten (10) days from the date of its entry.

**In re ACE LUMBER SUPPLY, INC., Debtor.**

**Bankruptcy No. 89–10570–007.**

United States Bankruptcy Court, D. Montana.

Oct. 4, 1989.

Craig D. Martinson, Billings, Mont., for debtor.

R. William Walsh, Great Falls, Mont., for Minot Builders.

Victoria L. Francis, Billings, Mont., trustee.

Neal G. Jensen, Great Falls, Mont., Asst. U.S. Trustee.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 7 case, the Trustee has filed objections to the motion of Minot Builders Supply for relief from the automatic stay under § 362 of the Code. The basis for the objections is that Minot is not a secured creditor as alleged in the motion. The issue raised by the parties involves whether the Debtor executed a security agreement in favor of Minot to entitle Minot to perfect a security interest in Debtor's inventory, accounts receivable and equipment. Hearing on the motion and objections was held on September 12, 1989, and the parties have submitted memorandums in support of their respective position.

The facts show the Debtor pre-petition operated a retail building supply business and purchased a number of products at wholesale from Minot. By April, 1988, the Debtor's account with Minot was about $160,000.00 and was in default. On April 26, 1988, a telephone conversation took place between two representatives of Minot and Debtor's president, which discussed the delinquent account and future credit purchases between the parties. A copy of the financial statement of the Debtor was reviewed by the parties and Richard Winje, vice president of Minot took notes of the telephone conversation which reflect a series of numbers about Debtor's financial affairs. The parties decided the Debtor would pay cash on delivery for all future purchases and attempt to pay on the delinquent account in the ensuing two to three weeks.

On May 25, 1988, another three way conversation between representatives of both companies took place. Taylor, the Debtor's president, was in the office of Minot's credit manager, who arranged a telephone call with Winje in Minot, North Dakota. Again, Winje took personal notes about the delinquent obligation. Taylor agreed, and the notes of Winje reflect, that the Debtor would pay $35,000.00 per month, with interest at 1% over prime, on the delinquent

balance, a cash discount would be granted on new purchases if payment was timely made, the current purchases would be limited to $10,000.00 per month, and both the delinquent account and current purchases would be secured by Debtor's inventory, accounts receivable and equipment. The Winje notes are attached to this Order. (Evergreen Exhibit # 2) Taylor represented no other security interest had been given to any creditor in such items. Minot's credit manager prepared a U.C.C.–1 financing statement, which was signed by Taylor. A copy was sent to Winje, who signed on behalf of Minot and the U.C.C.–1 financing statement was then sent to the Montana Secretary of State office, where it was filed on June 2, 1988. Subsequent to the agreement, one payment of $35,000.00 was made on the account by the Debtor, but no other payments were made. The agreed payment schedule was modified in November, 1988, but by the date of the bankruptcy petition on May 1, 1989, the Debtor was indebted to Minot in the sum of $162,-031.00. Minot was scheduled as a secured creditor in the Debtor's Schedules. Other than the U.C.C.–1 financing statement, no other documents have been signed by the Debtor. All parties believed the execution of the U.C.C.–1 financing statement was sufficient to satisfy the Montana Uniform Commercial Code in order to create a valid security interest by Minot in Debtor's assets.

Based on these facts, Minot asserts in its Motion for Relief from the Automatic Stay that it has a valid security interest in the Debtor's assets described in the U.C.C.–1 financing statement. The Trustee contests such assertion on the basis that Section 30–9–203, Mont.Code Ann. requires a security agreement signed by the Debtor, and that execution of the U.C.C.–1 financing statement does not satisfy the requirement of Section 30–9–203.

Montana has adopted the provisions of the Uniform Commercial Code regarding perfection of security interests in property. As is pertinent to the present case, Section 30–9–203, supra, states:

"* * *, a security agreement is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

(a) * * * the debtor has signed a security agreement which contains a description of the collateral * * *."

In order to perfect the security agreement and interest in the collateral against the Debtor and third parties, such as the Trustee in this case, Section 30–9–302, Mont. Code Ann. requires in most instances, a financing statement to be filed with the Secretary of State. Section 30–9–401, Mont.Code Ann. The formal requisites of a financing statement are detailed in Section 30–9–402, Mont.Code Ann.

In discussing the requisites of a security agreement required under U.C.C. § 9–203(1), the Official Code Comment reflects:

"1. Subsection (1) states three basic prerequisites to the existence of a security interest: agreement, value and collateral. In addition, the agreement must be in writing unless the collateral is in possession of the secured party. When all of these elements exist, the security agreement becomes enforceable between the parties and is said to 'attach'. Perfection of a security agreement (see Section 9–303) will in many cases depend on the additional step of filing a financing statement (see Section 9–302) or possession of the collateral (Sections 9–304(1) and 9–305).

\* \* \* \* \* \*

3. One purpose of the formal requisites stated in subsection (1)(a) is evidentiary. The requirement of written record minimizes the possibility of future disputes as to the terms of a security agreement and as to what properly stands as collateral for the obligation secured.

\* \* \* \* \* \*

5. The formal requisite of a writing stated in this section is not only a condition to enforceability of a security interest against third parties, it is in the nature of a Statute of Frauds. Unless the secured party is in possession of the collateral, his security interest,

absent a writing which satisfies paragraph (1)(a), is not enforceable even against the debtor, and cannot be made so on any theory of equitable mortgage or the like. If he has advanced money, he is of course a creditor, and, like any creditor, is entitled after judgment to appropriate process to enforce his claim against his debtor's assets; he will not, however, have against his debtor the rights given a secured party by Part 5 of this Article on Default. The theory of equitable mortgage, insofar as it has operated to allow creditors to enforce informal security agreements against debtors, may well have developed as a necessary escape from the elaborate requirements of execution, acknowledgment and the like which the nineteenth century chattel mortgage acts vainly relied on as a deterrent to fraud.

Since this Article reduces formal requisites to a minimum, the doctrine is no longer necessary or useful. More harm than good would result from allowing creditors to establish a secured status by parol evidence after they have neglected the simple formality of obtaining a signed writing."

*Anderson, Uniform Commercial Code,* Vol. 8, § 9–203:1, pp. 660–661. (3rd Ed.)

*Anderson,* supra, § 9–203:18, p. 670, further states:

"When the secured transaction is nonpossessory, the security agreement must be in writing. * * * The requirement of a written security agreement is in the nature of a statute of frauds * * *. When a written security agreement is required but there is none, the creditor does not have a security interest in the collateral and can not enforce an oral agreement that he have such an interest as against the debtor or third parties."

The facts here show no formal security agreement was signed by the Debtor. What was signed by the Debtor was a standard U.C.C.–1 financing statement, attached to this Order. (Evergreen Exhibit # 8) The creditor contends such suffices

as a security agreement, citing *In re Amex–Protein Development Corporation,* 504 F.2d 1056 (9th Cir.1974). In that case, a promissory note was signed by the debtor which included language that the note "is secured by a security interest in subject personal property as per invoices". A financing statement signed by the debtor was also filed of record describing items of personal property. There was no issue in the case that the parties intended, as they did in the present case, to create a security interest in the property described in the financing statement. Thus, two documents were signed, a promissory note and a financing statement. Under these facts, the Ninth Circuit Court of Appeals, adopting the district court holding, stated:

"The Court [Evans v. Everett, 183 S.E.2d 109] found that since a security agreement could serve as a financing statement, there would be no sound reason why the converse should not be true. The court held that the financing agreement before it qualified as a security agreement.

\*   \*   \*   \*   \*   \*

Accordingly, the promissory note herein qualifies as a security agreement which by its terms 'creates or provides for' a security interest."

Yet, *Matter of Bollinger Corp.,* 614 F.2d 924, 927 (3rd Cir.1980), discussing the holding of *Amex–Protein Development Corp.,* supra, states *Amex* "concluded that as long as the financing statement contains a description of the collateral signed by the debtor, the financing statement may serve as the security agreement and the formal requirements of Section 9–203(1) are met". The Third Circuit continued:

"Some courts have declined to follow the Ninth Circuit's liberal rule allowing the financing statement alone to stand as the security agreement, but have permitted the financing statement, when read in conjunction with other documents executed by the parties, to satisfy the requirements of Section 9–203(1)(b)".

The Third Circuit adopted the so-called "composite document" rule by reading the promissory note, financing statement and

correspondence between the parties together.

"When the parties have neglected to sign a separate security agreement, it would appear that the better and more practiced view is to look at the transaction as a whole in order to determine if there is a writing, or writings, signed by the debtor describing the collateral which demonstrates an intent to create a security interest in collateral." *Id.* at 928.

The Court concluded the "minimum formal requirements of Section 9–203(1)(b) [30–9–203(1)] were met by the financing statement and the promissory note, and the course of dealings between the parties indicates the intent to create a security interest".

I do not read the holding of *Amex–Protein* under the facts of that case as allowing a security interest to attach where the only document signed by the debtor was the financing statement. Indeed, *Amex* specifically set the issue as:

"Did the Promissory Note Create or Provide for a Security Interest?"

and held that when the note was read with the financing statement a security interest was created. Moreover, according to *Bollinger,* citing *In re Numeric Corp.,* 485 F.2d 1328 (1st Cir.1973), "although a standard form financing statement by itself cannot be considered a security agreement, an adequate agreement can be found when a financing agreement is considered together with other documents". *Id.* at 927. *See, e.g. also, In re Dargis,* 44 B.R. 985, 986 (Bankr.E.D.Pa.1984).

I conclude that under Montana law the composite document rule is available to provide evidentiary support to create a security intent in collateral. That rule, however, does not allow only a financing statement signed by the debtor to satisfy § 30–9–203(1). In this regard, I find a major distinction between *Amex–Protein* and the facts in the case *sub judice.* Other than the financing statement signed by the Debtor, the only other writing presented by the creditor were handwritten telephone notes attached to this Order. The combination of the financing agreement and the

telephone notes do not satisfy the requirements of Article 9 in that none of them contain any language creating a security interest in the collateral. As *Amex–Protein* states:

"While there are no magic words which create a security interest there *must be language in the instrument* which 'leads to the logical conclusion that it was the intention of the parties that a security interest be created.'" *Id.* at 1059. (Emphasis supplied).

Further, *In re Owensboro Canning Co., Inc.,* 82 B.R. 450, 453–54 (W.D.Ky.1988), interpreting identical Uniform Commercial Code sections under § 9–203 and § 9–105 holds:

"Giving due consideration in tandem to § 9–203 and § 9–105 of the Code, Wright and Summers contend that the question of whether a security agreement is established calls for two independent inquiries which may be stated as follows: The *court* must first resolve, *as a question of law,* whether the language embodied in the writing objectively indicates that the parties may have intended to create or provide for a security agreement. [citations omitted]. If the language crosses this objective threshold [citations omitted], that is, if the *writing* evidences a possible secured transaction and thus satisfies the statute of frauds requirement, then the *factfinder* must inquire whether the parties actually intended to create a security interest. [citations omitted]. Parol evidence is admissible to inform the latter [citations omitted], but not the former, inquiry. Wright & Summers, supra."

Other courts have followed the same test. *In re Zurliene,* 97 B.R. 460, 464 (Bankr.S.D.Ill.1989), states:

"While this court agrees with Community [creditor] that no *specific* words of grant are necessary in order to create a security agreement, it also believes that, in the absence of a separate written security agreement there must be some language to reflect the parties desire to grant a security interest, in the doc-

uments surrounding the transaction, in order to establish the existence of a security agreement under ICC § 9–203. *In re Modafferi,* 45 B.R. 370, 372 (S.D.N.Y. 1985); *In re Murray Brothers,* 53 B.R. 281, 284 (Bankr.E.D.N.C.1985)."

*Murray Brothers,* supra at 284, holds:

"[2] Clearly under the minimum requirements enunciated by the North Carolina Supreme Court in *Evans v. Everett* [279 N.C. 352, 183 S.E.2d 109 (1971)], and under other cases finding security agreements in a document or series of documents not denominated as such, one common thread is found in every case, the intent to create a security agreement must appear on the face of a written document or documents executed by the debtor. None of the documents presented to the court by Mr. Maroon show any intent to create a security interest. The promissory note and financing statement make no reference to any security or security interest as in *Evans v. Everett.* The sales agreement recites an absolute sale with no reference to security for the debt owed to Mr. Maroon; the agreement, in fact, states by its own terms that it is the entire agreement of the parties and may not be amended or modified except by the written consent of the parties.

■ Mr. Maroon's attorney argued that the intent to create a security interest in the assets sold by Mr. Maroon to the debtor is found in the parties' act of signing and filing a financing statement. Counsel argues that the parties would file a financing statement for no other reason than to perfect a security interest.

Financing statements may be filed to perfect a security interest after or contemporaneously with the attachment of a security agreement, but that is not their only use. A financing statement may also be filed before the attachment of a security interest as a notice to third parties that a security interest may be claimed in the future by the filing party. Priority of the claimant's security interest would then date back

to the date of filing. N.C.GEN.STAT. § 25–9–312(5)(a); R. Lord & C. Lewis, *North Carolina Security Interests,* § 3–2(a), at 32 (1985). Since a financing statement may be filed for reasons other than the perfection of an existing security interest, the filing of a financing statement alone is not enough to create a security interest; 'it is but one step in the means by which the rights and priorities of a secured party are "perfected".' *Mid–Eastern Electronics, Inc. v. First National Bank of Southern Maryland,* 380 F.2d 355, 356 (4th Cir.1967); *Evans,* 279 N.C. at 358 [183 S.E.2d 109]; *E–B Grain Co. v. Denton,* 73 N.C.App. 14, 19, 325 S.E.2d 522 (1985).

\*      \*      \*      \*      \*      \*

■ The determination of whether a security interest exists is a two-step process. First, the court must determine as a question of law whether the language in the writing required by N.C. GEN.STAT. § 25–9–203 objectively indicates that the parties intended to create a security interest. If the statute of frauds requirement is met, then the factfinder must determine whether the parties actually intended to create a security interest. Parol evidence may be admitted to interpret an ambiguous writing but may not be introduced to satisfy the statute of frauds requirement. *White & Summers,* § 23–3, at 905. Since writings have not been introduced to satisfy the statute of frauds requirement, the court may not consider parol evidence to determine the parties' intent at the time of the transaction." *Id.* at 284–285.

*Evans v. Everett,* supra, was a decision relied upon by the Ninth Circuit in *Amex–Protein.* Finally, *In re Modafferi,* supra at 372, correctly states:

"The strong weight of authority is of the view that although it is not necessary to present a separate, formal document entitled 'security agreement' to establish a valid security interest, *see, e.g., In re Numeric Corp.,* 485 F.2d [1328] at 1331 [(1st Cir.1973)]; *General Motors Ac-*

ceptance Corp. v. Lefevre (*In re Lefevre*), 27 B.R. 40, 42–43 (Bkrtcy.D.Vt. aff'd, 38 B.R. 980 (D.Vt.1983); *Winshall v. McCormick* (*In re McCormick*), 24 B.R. 718, 720 (Bkrtcy.E.D.Mich.1982), a standard form financing statement, standing alone, does not constitute a security agreement. *Transport Equipment Company v. Guaranty State Bank*, 518 F.2d 377, 380 (10th Cir.1975); *In re Numeric*, 485 F.2d at 1331; *Mitchell v. Shepherd Mall State Bank;* 458 F.2d 700, 703–04 (10th Cir.1972); *Mid Eastern Electronics, Inc. v. First National Bank*, 380 F.2d 355, 356 (4th Cir. 1967); *In re Carmichael Enterprises, Inc.*, 334 F.Supp. 94, 104 (N.D.Ga.1971), aff'd, 460 F.2d 1405 (5th Cir.1972) (mem.); *In re Mann*, 318 F.Supp. 32, 35–36 (W.D.Va.1970); *Needle v. Lasco Industries, Inc.*, 10 Cal.App.3d 1105, 1108–09, 89 Cal.Rptr. 593, 595–96 (1970); *American Card Co. v. H.M.H. Co.*, 97 R.I. 59, 62, 196 A.2d 150, 152 (1963). *But see In re Dayton Suzuki, Inc.*, 27 B.R. 915 (Bkrtcy.S.D.Ohio 1983). Indeed, official comment 2 to U.C.C. § 9–402 explains that the financing statement alone 'indicates merely that the secured party who has filed *may* have a security interest in the collateral described.' (emphasis added)."

Again, *Amex–Protein*, like *Modafferi*, relied in part on the same decision for their holding, citing *In re Carmichael Enterprises, Inc.*, supra. Concededly, *Amex–Protein* rejected the holding of *American Card*, supra.

Applying the above law, I conclude there simply is no language in the only written instrument signed by the Debtor in this case (the financing statement) which embodies any intent to create a security agreement. There are no promissory notes, invoices or written correspondence which grant, create or "objectively indicates the parties intended to create a security interest". I hold as a matter of law the U.C.C.–1 financing statement standing alone is insufficient under § 30–9–203, Mont.Code Ann., to create a security interest in the Debtor's assets. The objections of the Trustee are thus well taken.

IT IS ORDERED the Motion for Relief From the Automatic Stay filed by Minot Builders Supply Association is denied.

5-25-88    4:15 PM

ACE LUMBER & SUPPLY

✓ UCC 1                                          ACCT #
$ 35,000 /MONTH      ✓ start    $ 164,000

✓ 1.7% OVER PRIME  9¾

✓ CASH DISCOUNT ON NEW
        PURCHASES - WE WILL
            ALLOW IF TIMELY.

✓ NO NSF CHECKS !!

✓ 3 ACCOUNTS:
        ACE LBR
        REMODELING CTR
        VLS MACH. STAINING

✓ $ 10,000      COMBINED LIMIT
                OVER LIMIT COD

✓ CURRENT FIN. STMT. ?  WILL FAX

    CONCERNS -
            VOLUME
            EXPENSES

Chuck comments:
no other acc-1 @ Chuck
Internal Problems - gross profit of 15 %
Looking to move .  affected by inventory
                    shrinkage. no details
Wants ucc 1 lifted after debt paid. "ok"
sell one truck
John, Chuck & me

EVERGREEN EXHIBIT NO. 8

This FINANCING STATEMENT is presented to a filing officer for filing pursuant to the Uniform Commercial Code.

For Filing Officer (Date, Time, Number and Filing Office)

| Debtor(s) Legal (Last Name, first name, middle initial) and mailing address | Secured Party(ies) Name and address: |
|---|---|
| Ace Lumber Supply, Inc. P.O. Box 1915 Billings, Mt. 59103 (Yellowstone County) SOCIAL SECURITY NO.: | Minot Builders Supply Assoc. P.O. Box 1288 Minot, ND 58702 |

29|2|7|3|7

SECRETARY OF STATE
MONTANA

1983 JULY -2 AM 10: 17

This Financing Statement covers the following types (or items) of collateral (if collateral is crops growing or to be grown or goods which are or are to become fixtures, also describe real estate concerned and add, name and address of record owner or record lessee of real estate):

All inventory now owned or hereafter acquired
All Accounts Receivable now outstanding or hereafter arrising
All equipment now owned or hereafter acquired

Name and address of Assignee of Secured Party:

Name and address of record owner or lessee of real estate concerned:

Check [X] if covered- [XX] Proceeds of collateral are also covered. [XX] Products of collateral are also covered. Number of additional sheets presented: ...

Filed with

TERMINATION STATEMENT - No Filing Fee

This Statement of Termination of financing is presented to a Filing officer for filing pursuant to the Uniform Commercial Code. The Secured Party certifies that the Secured Party no longer claims a security interest under the Financing Statement bearing the file Number shown above.

Dated .................................................................... 19..........

By: ...................................................................
Signature of Secured Party or Assignee of Record—Not Valid Until Signed

3) Filing Officer—Acknowledgment—Filing Officer endorse filing data on this copy and return it to the person filing as an acknowledgment.