643 N.E.2d 313 (1994)
GIBSON COUNTY FARM BUREAU COOPERATIVE ASSOCIATION, Inc., Appellant,
v.
Norman GREER, Appellee, (Judgment Defendant below), and Miles, Inc., d/b/a Miles Farm Center, Appellee, (Garnishment Defendant below).
No. 26S01-9411-CV-1122.
Supreme Court of Indiana.
November 28, 1994.
Rehearing Denied April 26, 1995.
*314 Christopher E. Baker, Rubin & Levin, Indianapolis, James G. McDonald, McDonald & McDonald, Princeton, for appellant.
C. Dean Higginbotham, Princeton, for appellee.

ON PETITION TO TRANSFER
SULLIVAN, Justice.
We grant a petition to transfer the decision of the Court of Appeals in Gibson County Farm Bureau v. Greer (1993), Ind. App., 622 N.E.2d 551, to address whether a financing statement may also serve as a security agreement under Article 9 of the Uniform Commercial Code.

Facts
The record reflects that Miles Farm Center (Miles) advanced $17,606.83 in credit to Greer in connection with Greer's farming operations. On June 19, 1991, Miles filed a standard UCC-1 financing statement covering Greer's corn and soybean crops. The financing statement 1) was signed by Greer as debtor; 2) identified Miles as a secured *315 party; 3) identified the collateral as "all corn and soybeans, presently growing, or to be planted on the following farms, and not limited to, including any additional acreage cultivated in 1991. (See Exhibit A)"; and 4) identified the land on which the crops were to be grown in an attached "Exhibit A."
On October 8, 1991, Greer sold some of his crop to Consolidated Grain and Barge, Inc. (Consolidated Grain) and received a check from Consolidated Grain for $9,995.35. The check was jointly payable to the order of "Norman Greer & Miles Farm Supply, Inc./Miles Farm Center & Princeton Farms & Gibson County Farm Bureau."
After Greer received the check from Consolidated Grain, he endorsed it and delivered it to Miles. Miles contacted Princeton Farms and Gibson County Farm Bureau (Farm Bureau) about obtaining their endorsements. Princeton agreed to endorse the check; Farm Bureau refused and disputed the priority of Miles's right to the money represented by the check. The check remains in Miles's possession; the funds remain in Consolidated Grain's bank account.
On March 9, 1992, Farm Bureau obtained a default judgment against Greer in the amount of $35,351.74.
On March 18, Farm Bureau instituted proceedings supplemental against Greer and against Consolidated Grain as a garnishee-defendant. Consolidated Grain was required to answer Farm Bureau's interrogatories relating to Greer's assets that Consolidated Grain had in its possession.
On April 18, Consolidated Grain answered that it owed Greer one outstanding check and attached a photocopy of the check dated October 8, 1991 and drawn in the amount of $9,995.33.
On July 27, Farm Bureau instituted proceedings against Miles as an additional garnishee-defendant.
On September 28, in answer to interrogatories from Farm Bureau, Miles stated that it was in possession of the uncashed check for $9,995.33. Miles also stated that Greer owed it $17,606.83 on the basis of an "unpaid account."
On September 29, the Gibson Circuit Court held a hearing on Farm Bureau's claim. On January 28, 1993, the trial court found that Miles had a security interest in the proceeds from the sale of Greer's crops and it entered judgment for Miles, ordering Farm Bureau to endorse the check in favor of Miles.
Farm Bureau appealed the trial court's decision. The Court of Appeals reversed the trial court, deciding that as a matter of law Miles had no security interest in the money represented by the check, and that because Farm Bureau was a judgment lien creditor, Farm Bureau's interest was superior to that of Miles.

Standard of Review
The trial of this case was to the court sitting without a jury. Indiana Trial Rule 52(A) therefore governs our review of the trial court's decision. Trial Rule 52(A) provides in part:
On appeal of claims tried by the court without a jury or with an advisory jury, at law or in equity, the court on appeal shall not set aside the findings or the judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses.
Ind.Trial Rule 52(A). See also Egly v. Blackford County Dep't of Public Welfare (1992), Ind., 592 N.E.2d 1232, 1234-35. When a trial court has made special findings of fact, as it did in this case, its judgment is clearly erroneous only if 1) its findings of fact do not support its conclusions of law or 2) its conclusions of law do not support its judgment. Estate of Reasor v. Putnam County (1994), Ind., 635 N.E.2d 153, 158, reh'g denied; Kaminszky v. Kukuch (1990), Ind. App., 553 N.E.2d 868, 870, trans. denied. Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. Reasor, 635 N.E.2d at 158.

Discussion
This case presents the single question of whether Miles had a security interest in the *316 crops that Greer sold to Consolidated Grain.[1] The answer to that question depends entirely on whether the UCC-1 financing statement that Miles properly filed with the Recorder of Gibson County[2] also served effectively as a security agreement. If it did, then Miles had a perfected security interest in the proceeds from Greer's sale of his crops, and its claim had priority over Farm Bureau's.

I.
In order to perfect a security interest in Greer's crops, the UCC requires Miles to have done two things. First, Miles had to have a security interest to perfect. Citizens Nat'l Bank of Evansville v. Wedel (1986), Ind. App., 489 N.E.2d 1203, 1205. See also In re R. & L. Cartage & Sons, 118 B.R. 646, 649 (Bankr.N.D.Ind. 1990). The UCC provides: "A security interest attaches when it becomes enforceable against the debtor with respect to the collateral. Attachment occurs as soon as all of the events specified in subsection (1) have taken place unless explicit agreement postpones the time of attaching." § 9-203(2). Subsection (1) provides in part:
[A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:
(a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned;
(b) value has been given; and
(c) the debtor has rights in the collateral.
§ 9-203(1).
Second, having fulfilled the requirements of § 9-203 and having thereby acquired a security interest in the crops, Miles had to perfect that interest either by filing a financing statement as required by § 9-302(1), or by taking possession of the collateral as required by §§ 9-302(1)(a) and 9-305. Wedel, 489 N.E.2d at 1205.
Although usually the filing of a financing statement will occur only after a security interest has attached under § 9-203, the UCC specifically provides that a party may file a financing statement before a security interest has attached. § 9-402(1). When a party does file before the attachment of a security interest, the UCC provides that perfection occurs at the time the security interest attaches. § 9-303.
It is clear that in the usual case the UCC contemplates the existence of two documents before a security interest can be perfected. In re Bollinger Corp., 614 F.2d 924, 926-27 (3d Cir.1980). Before a security interest attaches, either the collateral must be in the possession of the secured party pursuant to some agreement between the parties or the debtor must have signed a security agreement describing the collateral and the land concerned if the collateral is crops. § 9-203(1). The UCC defines a security agreement as "an agreement which creates or provides for a security interest." § 9-105(1)(l).
Unless perfection is achieved either automatically or by possession of the collateral, for a security interest to be perfected a financing statement must be filed. § 9-302(1). With respect to what is required of a financing statement, the UCC provides:

*317 A financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor, and contains a statement indicating the types, or describing the items, of collateral... . When the financing statement covers crops growing or to be grown, the statement must also contain a description of the real estate concerned.
§ 9-402(1). The UCC also provides that a security agreement may serve as a financing statement if it contains the information required of a financing statement and is signed by the debtor.[3] § 9-402(1). The UCC is silent, however, about whether a financing statement may serve as a security agreement, and it is this question we must now decide.

II.
The parties do not dispute that the UCC-1 financing statement filed by Miles met the formal requirements of financing statements in general as set out in § 9-402(1). Norman Greer's name and address appeared in a box labeled "Debtor(s) (Last Name First) and Address(es)." Thus, it contained the name and mailing address of the debtor. "Miles Farm Center" appeared, together with its address, in a box labeled "Secured Party(ies) and Address(es)." Thus it contained an address of the secured party from which information concerning the security interest might be obtained. It also contained a statement indicating the types, or describing the items, of collateral in a box labeled "This Financing Statement covers the following types (or items) of property (include description of real estate when collateral is crops)." That statement read: "All corn and soybeans, presently growing, or to be planted on the following farms, and not limited to, including any additional acreage cultivated in 1991. (See Exhibit A)." The attached Exhibit A listed seven tracts of land over Greer's signature and under his name and mailing address. Thus, since the collateral was crops, the financing statement contained the required description of the real estate concerned. And finally, Greer's signature appeared over a line labeled "Signature of debtor (or Secured Party in cases covered by IC XX-X-X-XXX(2))". Thus, the financing statement was signed by the debtor.

III.
Because the financing statement was sufficient to perfect a security interest in Greer's crops, we must now determine whether Miles had a security interest to perfect. In order for a security interest to attach under § 9-203(2), three conditions must have been met: (a) the debtor must have "signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown ..., a description of the land concerned" (the "Writing Requirement"); (b) value must have been given; and (c) the debtor must have rights in the collateral. § 9-203(1). The parties also do not dispute that value had been given by Miles or that Greer had rights in the collateral crops. The only issue remaining, then, is whether the Writing Requirement had been met, i.e., whether the financing statement, signed by Greer as debtor, was sufficient under the UCC to serve also as an effective security agreement.

A.
Although many jurisdictions have had to address the question whether a financing statement may also serve as a security agreement, this is a question of first impression in Indiana state courts. The first case to consider the question was American Card Co. v. H.M.H. Co., 97 R.I. 59, 196 A.2d 150 *318 (1963).[4] In that case, the Supreme Court of Rhode Island had to examine a standard-form UCC financing statement that the lender asserted was sufficient, standing on its own, to constitute a security agreement. Applying the Rhode Island versions of § 9-203, which established the formal requirements for a security interest to attach, and § 9-402, which stated that some security agreements may serve as a financing statement if filed, the American Card court said that "while it is possible for a financing statement and a security agreement to be one and the same document it is not possible for a financing statement which does not contain the debtor's Grant of a security interest to serve as a security agreement." American Card, 196 A.2d at 151-52.

B.
It was the American Card rule that the Court of Appeals applied in this case when it decided that Miles had no security interest to perfect because the UCC-1 financing statement did not "contain any language which can be construed as actually conveying a security interest." Gibson County Farm Bureau, 622 N.E.2d at 556 (relying on American Card and, inter alia, Shelton v. Erwin, 472 F.2d 1118, 1120 (8th Cir.1973)).[5] This approach treats § 9-203 as a statute of frauds and is, to an extent, supported by Comment 5 to § 9-203, which says:
The formal requisites stated in this Section are not only conditions to the enforceability of a security interest against third parties. They are in the nature of a Statute of Frauds. Unless the secured party is in possession of the collateral, his security interest, absent a writing which satisfies subsection (1)(b), is not enforceable even against the debtor, and cannot be made so on any theory of equitable mortgage or the like... . Since this Article reduces formal requisites to a minimum, the doctrine is no longer necessary or useful. More harm than good would result from allowing creditors to establish a secured status by parol evidence after they have neglected the simple formality of obtaining a signed writing.
§ 9-203, Official Comment 5.
The American Card rule has often been criticized and has, for the most part, been rejected. In one of the most often quoted criticisms of the American Card rule, Grant Gilmore, one of the drafters of Article 9, wrote:
Certainly nothing in § 9-203 requires that the "security agreement" contain a "granting" clause. The § 9-402 financing statement contained all that was necessary to satisfy the § 9-203 statute of frauds as well as being sufficient evidence of the parties' intention to create a security interest in the tools and dies. No doubt the court would have upheld the security interest if the debtor had signed two pieces of paper instead of one. The § 9-402 provision that a short financing statement may be filed in place of the full security agreement was designed to simplify the operation. The Rhode Island court gives it an effect reminiscent of the worst formal requisites holding under the nineteenth century chattel mortgage acts.
1 Gilmore, Security Interests in Personal Property § 11.4, 342-348 (1965).[6]
*319 Most courts have followed the approach of Evans v. Everett, 279 N.C. 352, 183 S.E.2d 109 (1971). In Evans, the Supreme Court of North Carolina said, "While there are no magic words which create a security interest there must be language in the instrument which `leads to the logical conclusion that it was the intention of the parties that a security interest be created.'" Id. 183 S.E.2d at 113 (quoting In re Nottingham, 6 U.C.C.Rep. Serv. 1197, 1199, 1969 WL 11098 (U.S.D.C.Tenn. 1969) (Callaghan)).[7]

C.
With the focus on language evidencing the intent of the parties and not on whether there is a conveyance of a security interest, the majority of jurisdictions has adopted the so-called Composite Document Rule from In re Numeric Corp., 485 F.2d 1328 (1st Cir.1973). The In re Numeric Corp. court said that "although a standard form financing statement by itself cannot be considered a security agreement, an adequate agreement can be found when a financing statement is considered together with other documents." 485 F.2d at 1332. And another court described the rule as follows:
The Composite Document Rule is that there need not be a separate document labeled "Security Agreement" but rather all relevant loan documents may be examined to determine whether a security agreement exists... . An often unstated corollary to the Composite Document Rule is that the "evidence of agreement" can be that the documents examined would not have been written, signed, or worded as they are unless a security interest was granted.
In re Maddox, 92 B.R. 707, 711 (Bankr. W.D.Tex. 1988).[8]

D.
In contrast both to the cases following American Card and to those adopting the Composite Document Rule, all of which reject the idea that a standard, UCC-1 financing statement standing alone may serve as an effective security agreement, stands In re Amex-Protein Devel. Corp., 504 F.2d 1056 (9th Cir.1974), which has been often cited for the proposition that, as a matter of law, a standard-form financing statement is sufficient to satisfy the requirements of § 9-203(1)(a).[9]See, e.g., Maddox, 92 B.R. at 711; In re Smith, 47 B.R. 482, 484 (Bankr. N.D.Ohio 1985); In re Cambridge, 34 B.R. 88, 90 (Bankr.W.D.Mo. 1983).

IV.
While all of the cases we have referred to above treat the question whether a UCC-1 financing statement may serve as a security *320 agreement as a question of law, there are a handful of cases that have treated the question as one of both law and fact, following White & Summers, Uniform Commercial Code § 24-5 at 300 (2d ed. 1988), which says:
Ordinarily, the writing which satisfies the objective statute of frauds requirement above [§ 9-203(1)(a)] will also be sufficient proof of an actual intention to create such an interest in the first place. But in problem cases, the writing may barely meet the objective test and no more, leaving for further factual inquiry the question whether the parties also actually intended to create a security interest. Parol evidence is admissible to inform this second inquiry, but not the first.
See, e.g., In re Krause, 114 B.R. 582, 593-94 (Bankr.N.D.Ind. 1988)[10] ("Whether ... the agreement satisfies the threshold statute of frauds requirement ... is a question of law for the court. The factual issue of whether there was a meeting of the minds as to whether there was an underlying contractual intent to create a security agreement is a question of fact."); In re Ace Lumber Supply, Inc., 105 B.R. 964, 968-69 (quoting from White & Summers); Kreiger v. Hartig, 11 Wash. App. 898, 527 P.2d 483, 486 (1974) ("Whether a writing is or is not a security agreement is a question of fact. We hold that the trial court properly considered parol evidence in finding the parties intended that the application and the title certificate to the truck would create a security interest.")
We think this approach best reflects the policies underlying the Uniform Commercial Code. First, § 1-201(3) provides that "`Agreement' means the bargain of the parties as in fact found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance... ." (Emphasis added). Second, where the Writing Requirement of § 9-203(1)(a) has been satisfied  where there is a writing signed by the debtor identifying the collateral and the land involved when the collateral is crops  the definitions provided by the Code make it plainly apparent that the parties may have intended the writing to be a security agreement. For example, § 9-105(1)(c) provides that "`Collateral' means the property subject to a security interest... ." Thus, when a party has signed a document identifying certain property as "collateral," that may be a fact showing an intent to create a security interest in the collateral.
Similarly, § 9-105(d) defines "Debtor" as "the person who owes payment or other performance of the obligation secured." (Emphasis added.) Section 9-105(m) defines "Secured Party" as "a lender, seller, or other person in whose favor there is a security interest." (Emphasis added). When a party, then, signs a document as "Debtor" and identifies another party as "Secured Party," that also may be a fact indicating an intent to create a security interest in the collateral described.
Although we are not willing to go so far as to hold that a standard-form UCC-1 financing statement alone is, as a matter of law, sufficient evidence that the parties intended to create a security interest, we do hold that once the Writing Requirement of § 9-203(1) is satisfied, whether the parties intended the writing to create a security interest is a question of fact for the trier of fact to determine.
No one disputes that the UCC-1 financing statement satisfied the Writing Requirements of § 9-203(1). It was signed by Greer as Debtor and identified both the collateral crops and the land on which the crops were to be grown. As a matter of law, the UCC-1 financing statement filed in this case was a sufficient writing to satisfy § 9-203(1). Since the trial court found that Miles had a security interest in the crops sold by Greer, we cannot say on this record that it was clearly erroneous to conclude, as a matter of fact, that Greer and Miles intended the financing *321 statement also to serve as a security agreement creating a security interest.[11]

Conclusion
Accordingly, we now grant transfer, vacate the opinion of the Court of Appeals, and affirm the judgment of the trial court in Miles's favor. Ind.Appellate Rule 11(B)(3).
SHEPARD, C.J., and DeBRULER and DICKSON, JJ., concur.
GIVAN, J., dissents with separate opinion.
GIVAN, Justice, dissenting.
I respectfully dissent from the majority opinion. The Uniform Commercial Code by nature is technical and the provisions thereof must be abided by in order to maintain uniform understanding of its enforcement.
Although I cannot argue with the equities of the situation in the case at bar, I am forced to agree with the opinion of the Court of Appeals reported at 622 N.E.2d 551. The concern stated by the majority opinion might well be presented to the legislature for modification of the code. However, I think the courts are required to adhere strictly to the code and should not attempt an amendment by judicial fiat.
I would deny transfer in this case or in the alternative grant transfer and adopt the opinion of the Court of Appeals.
NOTES
[1] Because neither party argues its right to the money on the basis of a purchase money lien on the crops, that argument is waived. Ind.Appellate Rule 8.3(A)(7); Clemens v. State (1993), Ind., 610 N.E.2d 236, 244, reh'g denied. The argument is similarly waived that Greer delivered all of his interest in the proceeds to Miles when he endorsed the check and handed it over to Miles and that there was nothing left, therefore, for Farm Bureau to attach.
[2] Miles properly filed the financing statement with the recorder of Gibson County since that is where Greer resided and where the crops were growing or to be grown. § 9-401. (The provisions of the UCC adopted by Indiana are to be found in Title 26, Article 1 of the Indiana Code. We shall refer to the Indiana versions of UCC provisions by section number rather than to the full statute.)
[3] The Court of Appeals incorrectly stated that § 9-402(1) permits a security agreement to serve as a financing statement only if it is signed by both parties. Gibson County Farm Bureau, 622 N.E.2d at 656. It is true that until 1985 the signatures of both parties were required. The legislature, however, amended Indiana Code § 26-1-9-402 in 1985. 1985 Ind. Acts, P.L. 93, § 27. The current Indiana Code § 26-1-9-402(1) specifically says, "A copy of the security agreement is sufficient as a financing statement if it contains the above information and is signed by the debtor." Thus, the debtor's signature alone now suffices.
[4] For discussions of the development of the American Card rule, see, for example, In re Bollinger Corp., 614 F.2d 924, 926-27 (3d Cir.1980), In re Maddox, 92 B.R. 707, 709-10 (Bankr. W.D.Tex. 1988), Simplot v. Owens, 119 Idaho 243, 805 P.2d 449, 451 (1990), and Crete State Bank v. Lauhoff Grain Co., 195 Neb. 605, 239 N.W.2d 789, 791 (1973).
[5] For other cases apparently requiring language of conveyance, see, for example, Mitchell v. Shepherd Mall State Bank, 458 F.2d 700, 703-704 (10th Cir.1972); Safe Deposit and Trust Co. v. Berman, 393 F.2d 401, 403 (1st Cir.1968); Mid-eastern Electronics, Inc. v. First Nat'l Bank of Maryland, 380 F.2d 355, 355 (4th Cir.1967); In re R & L Cartage & Sons, 118 B.R. 646, 649 (Bankr.N.D.Ind. 1990); In re Sabelka, 57 B.R. 972, 974 (Bankr.N.D.Iowa 1986); In re Wood, 47 B.R. 774, 779 (Bankr.W.D.Wis. 1985); First County Nat'l Bank and Trust Co. v. Canna, 124 N.J. Super. 154, 305 A.2d 442, 444-45 (App.Div. 1973); Starman v. John Wolfe, Inc., 490 S.W.2d 377, 383 (Mo. Ct. App. 1973); L & V Co. v. Asch, 267 Md. 251, 297 A.2d 285, 289 (1972); Kaiser Aluminum and Chemical Sales, Inc. v. Hurst, 176 N.W.2d 166, 167 (Iowa 1970).
[6] See, for example, In re Amex-Protein Dev. Corp., 504 F.2d 1056, 1059-60 (9th Cir.1974); Maddox, 92 B.R. at 710; In re Owensboro Canning Co., 82 B.R. 450, 454-55 (Bankr.W.D.Ky. 1988); In re Walter W. Willis, Inc., 313 F. Supp. 1274, 1278 (N.D.Ohio 1970), aff'd, 440 F.2d 995 (6th Cir.1971) (mem.); Simplot, 805 P.2d at 451; Evans v. Everett, 279 N.C. 352, 183 S.E.2d 109, 112 (1971).
[7] See, e.g., In re Bollinger Corp., 614 F.2d at 928; In re Amex Protein, 504 F.2d 1056, 1058-59 (9th Cir.1974); In re Numeric Corp., 485 F.2d 1328, 1331 (1st Cir.1973); In re Ace Lumber Supply, Inc., 105 B.R. 964, 968-969 (Bankr.D.Mont. 1989); Maddox, 92 B.R. at 711; In re Owensboro Canning Co., 82 B.R. 450, 454-55 (Bankr. W.D.Ky. 1988); In re Lefevre, 27 B.R. 40, 42-43 (Bankr.D.Vt. 1983), aff'd, General Motors Acceptance Corp. v. Lefevre, 38 B.R. 980 (D.Vt. 1983); In re McCormick, 24 B.R. 718, 720 (Bankr. E.D.Mich. 1982); Simplot, 805 P.2d at 44; In re Carmichael Enterprises, 334 F. Supp. 94, 104-105 (N.D.Ga. 1971), aff'd, 460 F.2d 1405 (5th Cir.1972) (upon which In re Numeric Corp. in part relied).
[8] See also Bollinger Corp., 614 F.2d at 928:

When the parties have neglected to sign a separate security agreement, it would appear that the better and more practical view is to look at the transaction as a whole in order to determine if there is a writing, or writings, signed by the debtor describing the collateral which demonstrates an intent to create a security interest in the collateral.
For other cases applying the Composite Document Rule, see, for example, In re North Reddington Beach Assoc. 97 B.R. 90 (Bankr.M.D.Fla. 1989); In re Owensboro Canning Co., 82 B.R. 450 (Bankr.W.D.Ky. 1988); In re Smith, 47 B.R. 482 (Bankr.N.D.Ohio 1985); In re Cambridge, 34 B.R. 88 (Bankr.W.D.Mo. 1983); In re Summit Creek Plywood Co., 27 B.R. 209 (Bankr.D.Or. 1982); In re Rite-Cap, Inc., 7 B.R. 113 (Bankr. D.R.I. 1980); In re Penn Housing Corp., 367 F. Supp. 661 (W.D.Pa. 1973).
[9] Whether Amex-Protein stands for such a proposition, however, is doubtful. The question presented in that case was "Did the Promissory Note `Create or Provide' for a Security Interest." In re Amex-Protein, 504 F.2d at 1057.
[10] See also, e.g., Owensboro Canning Co., 82 B.R. at 453, In re Rex Group, 80 B.R. 774, 780 (Bankr. E.D.Va. 1987), In re Mesa Refining, Inc., 65 B.R. 724, 726-27 (Bankr.D.Colo. 1986) and In re Walter Willis, Inc., 313 F. Supp. 1274, 1278 (N.D.Ohio 1973) for the proposition that whether a lease is intended as a lease or to create a security interest is a question of fact.
[11] This is not to say that we condone or in any way approve the use of bare-bones UCC-1 financing statements as security agreements. We do not. We are constrained by our standard of review here to affirm the trial court. Had the trial court found that no security interest had been created, we would have been compelled to affirm that finding as well.